## SAN LORENZO TITLE & IMPROVEMENT CO. v. CLARDY et al.
### No. 2642.

Court of Civil Appeals of Texas. El Paso.
March 1, 1932.

Rehearing Denied March 24, 1932.

316

Sydney Smith, Knollenberg & Cameron, Joseph U. Sweeney, J. E. Quaid, and McKenzie, Walthall & Gamble, all of El Paso, for appellant.

Brown & Brooke and Turney, Burges, Culwell & Pollard. Richard F. Burges and Walter S. Howe, all of El Paso, for appellees.

PELPHREY, C. J.

This is a suit in trespass to try title to recover certain land situated on San Lorenzo banco. The trial court sustained appellees' general demurrer, and from that action this appeal has been perfected.

The allegations of the petition, in substance, are: That appellant is a common-law trust, and has its principal office in El Paso county, Tex.; that on October 2, 1930, appellant was lawfully seized and possessed of the property sued for, holding and claiming the same in fee simple (here follows a description of the land by metes and bounds); that on that date appellees unlawfully entered upon the premises and ejected appellant therefrom, and unlawfully withheld possession thereof; that the annual rental of the premises is $3,000; that appellant and its predecessors in title had been the owners of, and entitled to, the premises since 1898, claiming the same openly and adverse to all the world; that appellees have had the profits from the premises during all of said time; that the property claimed is a part of what is known as the San Lorenzo banco No. 302 (here follows a metes and bounds description of San Lorenzo banco); that prior to March 21, 1930, the banco was located within the territorial limits of the State of Chihuahua, republic of Mexico, but was on the left side of the Rio Grande river; that on said date the International Boundary Commission, acting under authority vested in it by the treaties between the United States of America and the United States of Mexico, classified the aforesaid land as a banco and eliminated the same; that by the Treaty of 1848 (9 U. S. Stat. 922) the then deepest channel of the Rio Grande river was made the boundary line between the two countries; that, pursuant to said treaty, a survey was made fixing said line, the line as so fixed being thereafter recognized as the true boundary line; that thereafter, on account of frequent changes in the course of the Rio Grande, many tracts were cut off from the country to which they belonged, causing uncertainty and confusion as to sovereignty and jurisdiction, whereby bona fide owners were deprived of their rightful possession, occupancy, and use thereof; that, in order to remedy such conditions, other treaties were made, one of which was a treaty creating an International Boundary Commission, in 1889 (26 U. S. Stat. 1512); that in 1905 the two governments made another treaty, one of the purposes of which was the elimination of the bancos in the Rio Grande river from the effects of article 2 of the Treaty of 1884; that in said Treaty of 1905 (35 U. S. Stat. 1863) the 58 bancos surveyed and described in the report of the consulting engineers, to which reference was made in the proceeding of the International Boundary Commission, were eliminated from the effects of article 2 of the Treaty of 1884 (24 U. S. Stat. 1012); that the broken red line shown on the maps prepared by the consulting engineers should be the boundary line, that is, it should follow the deepest channel of the stream; that the dominion and jurisdiction of so many of the 58 bancos as remained on the right bank of the river should pass to Mexico, and the dominion of those remaining on the left bank should pass to the United States of America; that said treaty further provided that thereafter the International Boundary Commission should be guided by the principle of elimination established in the treaty; that there was excepted from the provisions of the treaty all portions of land segregated by changes in the river bed, having an area of over 250 hectares, and having a population of over 200 souls; that the treaty also provided that the Boundary Commission should prepare maps, in a manner similar to that employed in the preparation of the maps of the 58 bancos, showing the

changes which had occurred as to bancos already formed but not yet surveyed and as to those to be formed in the future; that they should mark on the ground, with suitable monuments, the bed abandoned by the river, so that the boundaries of the bancos should be clearly defined; that the citizens of either country who should by virtue of the stipulations of the treaty be in the future located on the land of the other might remain thereon, or remove to any place they chose, and were free to keep or dispose of any property they possessed in the territory; that those who preferred might retain the citizenship of the country to which the banco formerly belonged or acquire the nationality of the country to which it would belong in the future; that property of all kinds situated on the bancos should be inviolably respected, and the present owners, their heirs, or those who should subsequently acquire it legally, should enjoy as complete security with respect thereto as if it belonged to citizens of the country where situated; that on March 21, 1930, the International Boundary Commission found the San Lorenzo banco No. 302 to be a true "banco"; that it had been cut off from Mexico by avulsion in 1898; that on the date of the finding, and long prior thereto, it had been a part of the United States of Mexico; that on said date the International Boundary Commission eliminated said banco, whereupon, by virtue of the provisions of the Treaty of 1905, it was ceded to and became territory of the United States of America; that, by virtue of the treaties, the private ownership of land on the left side of the river which belonged to Mexico would continue to reside in the claimants under the Mexican title; that the International Boundary Commission should determine and eliminate certain bancos formed by the action of the Rio Grande; that, when so eliminated, the sovereignty and jurisdiction should, by virtue of the treaties and the action of the International Boundary Commission, pass to the United States of America, and the land become a part of the county of Texas, the lines of which would inclose the same by extending them to the Rio Grande river as located at the time of such elimination; that the private ownership of land claimed under Mexican title was by the treaties, recognized and respected; that the San Lorenzo banco was Mexican territory, and owned by claimants under Mexican title prior to March 21, 1930, when the International Boundary Commission eliminated it, thereby passing the jurisdiction and sovereignty from Mexico to the United States; 'that said banco consisted of less than 250 hectares and less than 200 souls at the time it became a banco; that the property had been carried on the tax books of the city of Juarez, Mexico, and assessed at the sum of 500 pesos since 1898; that Alfredo Urias, a citizen of Mexico, on August 6, 1926, filed a petition with the judge of the court of first instance of the municipality of Juarez,

republic of Mexico, and advised that court of the existence of lots of vacant land in the town of San Lorenzo within the jurisdiction of the municipality which had been abandoned by the successors in interest of the original owners thereof, which lots composed one of the bancos formed by the change in the channel of the Bravo (Rio Grande) river between the United States and Mexico (a translation of the petition is here quoted); that, after due and legal procedure as provided by the laws of the state of Chihuahua, republic of Mexico, a judgment was rendered by said court declaring the land to be vacant land (translation of judgment here incorporated); that San Lorenzo banco No. 302 is a well-known tract of land, with well-defined boundaries, and from such description can be located on the ground; that the judgment aforesaid was a final and valid judgment in rem; that the court of first instance under and by virtue of the laws of Chihuahua ordered the land to be sold (here follows translation of order of sale); that, after all notices provided by law had been given, the land was sold to Alfredo Urias for 300 pesos; that thereupon the San Lorenzo banco became the property of Alfredo Urias in fee simple; that thereafter, after due and proper notice, a correction was made by the judge of said court as to the astronomic point of location in the description as said land (here follows a translation of the order of correction); that on the 5th day of August, 1927, a deed to the said land was executed to Urias by the judge of said court'(translation of deed here inserted); that the deed, aforesaid, was executed and delivered in accordance with the laws of the state of Chihuahua, republic of Mexico; that the court making all of the said orders, judgments, and proceedings had jurisdiction of the subject-matter, was a court of competent jurisdiction, and fully authorized to make same (here follows the quotation of articles 727, 728, 729, 730, 731, 732, 733 and 734, of the Civil Code of Chihuahua and of the Minute No. 123, of the Boundary Commission of March 21, 1930); that the order quoted was made within the scope of the jurisdiction and power of the International Boundary Commission; that the courts must take judicial knowledge of their acts; that the order, aforesaid, having been authorized and sanctioned and followed by the political arm of the government of the United States, is binding upon the courts thereof; that the court must take judicial knowledge of the laws of the state of Chihuahua which were pleaded, and all other laws governing, concerning, and pertaining to the title to said lands; that San Lorenzo banco, under and by virtue of the facts pleaded, became ceded territory from the United States of Mexico to the United States of America, and all judgments and decrees of the Courts of the state of Chihuahua pertaining to the title to San Lorenzo Banco became and are domestic judgments which are enti-

tled to full faith and credit in the courts of Texas; that San Lorenzo banco having been Mexican territory prior to the decision of the International Boundary Commission on March 21, 1930, and under the laws and constitution of Mexico, only citizens of Mexico could legally own the same (here follows article 2 of the Laws of February 1, 1856, and section 1, article 27, of the Constitution); that, by reason of those provisions, appellees, being citizens of the United States, could have no valid title to the lands in question; that the political arm of the government of the United States and the political arm of Mexico have agreed that the jurisdiction of eliminated bancos would not pass from the government of the country from which they were cut off until a date not earlier than the date of the finding by the International Boundary Commission that a banco existed; and that, both governments having agreed and acted upon such a policy, the same is binding upon the courts.

Appellant's petition concluded with a prayer for judgment for the title and possession of the land involved in the suit, for rents and damages for the use of its lands, for writ of restitution, and for all other relief, general and special, in law and in equity.

Opinion.

Appellant, in its brief, states the two propositions upon which it relies as follows: "That, the resolution of the International Boundary Commission dated March 21st, 1930, was within the power conferred upon it by treaty, was valid and binding, and had the effect of determining that the land in question had always belonged to Mexico, and of transferring sovereignty thereover to the United States; and that the proceedings in the Court of First Instance, City of Juarez, State of Chihuahua, Mexico, terminated in a valid judgment which had the effect of vesting title to the land in question in Alfredo Urias, plaintiff's predecessor in title."

Appellant contends that, having fully pleaded these facts, the trial court was in error in sustaining the general demurrer.

Appellees counter with the propositions: (1) That the treaty, as between the United States and Mexico, became effective on March 20, 1905 (35 U. S. Stat. 1863), and that neither Mexico nor any political subdivision thereof could change the status of the title to the land in question, after the treaty was signed, and that appellant acquired no title by virtue of his deed from the court of first instance; (2) that, appellant having specially pleaded that the land was in the actual territorial jurisdiction of the United States from and after 1898, the proceedings in the Mexican court were void, the land being without the jurisdiction, de jure or de facto, of that court; (3) that, the treaty of 1905 being merely the readjustment of the boundary

and not a cession of territory, it will be assumed that the territory has always been in Texas, rendering the proceedings in the Mexican court void; (4) that the judgment of the Mexican court is insufficient to show title in appellant, because the pleadings show a failure to comply with the Mexican law, that it is not a judgment in rem, that the Mexican court is not a domestic court, and the judgment is subject to collateral attack, there being no presumption supporting the legality or regularity thereof, the description of the land in the judgment is not sufficient to enable it to be located on the ground, and that the map and so-called correcting judgment cannot be considered in connection therewith.

The Treaty of Guadalupe Hidalgo, made in 1848 (9 U. S. Stat. 922), contained the following provision as to the boundary line between Mexico and the United States:

"Article V.

"The boundary line between the two republics shall commence in the gulf of Mexico, three leagues from land, opposite the mouth of the Rio Grande, otherwise called Rio Bravo del Norte, or opposite the mouth of its deepest branch, if it should have more than one branch emptying directly into the sea; from thence up the middle of that river, following the deepest channel, where it has more than one, to the point where it strikes the southern boundary of New Mexico; thence, westwardly, along the whole southern boundary of New Mexico (which runs north of the town called Paso) to its western termination; thence, northward, along the western line of New Mexico, until it intersects the first branch of the River Gila; (or if it should not intersect any branch of that river, then to the point on the said line nearest to such branch, and thence in a direct line to the same;) thence down the middle of the said branch and of the said river, until it empties into the Rio Colorado; thence across the Rio Colorado, following the division line between Upper and Lower California, to the Pacific Ocean. * * *

"In order to designate the boundary line with due precision upon authoritative maps, and to establish upon the ground landmarks which shall show the limits of both republics, as described in the present article, the two governments shall each appoint a commissioner and a surveyor, who, before the expiration of one year from the date of the exchange of ratifications of this treaty, shall meet at the port of San Diego, and proceed to run and mark the said boundary in its whole course to the mouth of the Rio Bravo del Norte. They shall keep journals and make out plans of their operations; and the result agreed upon by them shall be deemed a part of this treaty, and shall have the same force as if it were inserted therein. The two

governments will amicably agree regarding what may be necessary to these persons, and also as to their respective escorts, should such be necessary.

"The boundary line established by this article shall be religiously respected by each of the two republics, and no change shall ever be made therein, except by the express and free consent of both nations, lawfully given by the general government of each, in conformity with its own constitution."

The treaty contained the further provisions relative to the property rights of individuals:

## "Article VIII.

"Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax, or charge whatever.

"Those who shall prefer to remain in the said territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty; and those who shall remain in the said territories after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States.

"In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States."

In 1853 a dispute arose between the representatives of the two countries as to whether that part of the boundary line along the southern boundary of New Mexico had been actually traced by the boundary commission according to the treaty of 1848.

A treaty known as the Gadsden Treaty was made in 1853 (10 U. S. Stat. 1031), fixing the line as claimed by the United States. The treaty contained the following:

## "Article VI.

"No grants of land within the territory ceded by the first article of this treaty bearing date subsequent to the day—twenty-fifth of September—when the minister and subscriber to this treaty on the part of the United States, proposed to the Government of Mexico to terminate the question of boundary, will be considered valid or be recognized by the United States, or will any grants made previously be respected or be considered as obligatory which have not been located and duly recorded in the archives of Mexico."

The correspondence between the representatives of the two governments shows that later a question arose as to whether the deepest channel of the river should remain the boundary in cases where it was changed by sudden avulsion.

The governments, in 1884 (24 U. S. Stat. 1011), made a treaty relative to changes in the river bed containing the following:

## "Article I.

"The dividing line shall forever be that described in the aforesaid Treaty and follow the centre of the normal channel of the rivers named, notwithstanding any alterations in the banks or in the course of those rivers, provided that such alterations be effected by natural causes through the slow and gradual erosion and deposit of alluvium and not by the abandonment of an existing river bed and the opening of a new one.

## "Article II.

"Any other change, wrought by the force of the current, whether by the cutting of a new bed, or when there is more than one channel by the deepening of another channel than that which marked the boundary at the time of the survey made under the aforesaid Treaty, shall produce no change in the dividing line as fixed by the surveys of the International Boundary Commissions in 1852; but the line then fixed shall continue to follow the middle of the original channel bed, even though this should become wholly dry or be obstructed by deposits."

## "Article V.

"Rights of property in respect of lands which may have become separated through the creation of new channels as defined in Article II hereof, shall not be affected thereby, but such lands shall continue to be under the jurisdiction of the country to which they previously belonged. * * *"

That questions continued to arise is evidenced by the treaty made in 1889 (26 U. S. Stat. 1512), creating a Boundary Commission. The following provisions thereof show the purpose for and the intention of the two governments as to the duties and powers of said Commission:

"The United States of America and the United States of Mexico, desiring to facilitate the carrying out of the principles contained in the treaty of November 12th, 1884, and to avoid the difficulties occasioned by reason of the changes which take place in

the bed of the Rio Grande and that of the Colorado River, in that portion thereof where they serve as a boundary between the two Republics, have resolved to conclude a treaty for the attainment of these objects, and have appointed as their respective Plenipotentiaries. * * *

### "Article I.

"All differences or questions that may arise on that portion of the frontier between the United States of America and the United States of Mexico where the Rio Grande and the Colorado Rivers form the boundary line, whether such differences or questions grow out of alterations or changes in the bed of the aforesaid Rio Grande and that of the aforesaid Colorado River, or of works that may be constructed in said rivers, or of any other cause affecting the boundary line, shall be submitted for examination and decision to an International Boundary Commission, which shall have exclusive jurisdiction in the case of said differences or questions."

### "Article IV.

"When, owing to natural causes, any change shall take place in the bed of the Rio Grande or in that of the Colorado River, in that portion thereof wherein those rivers form the boundary line between the two countries, which may affect the boundary line, notice of that fact shall be given by the proper local authorities on both sides to their respective Commissioners of the International Boundary Commission, on receiving which notice it shall be the duty of the said Commission to repair to the place where the change has taken place or the question has arisen, to make a personal examination of such change, to compare it with the bed of the river as it was before the change took place, as shown by the surveys, and to decide whether it has occurred through avulsion or erosion, for the effects of Articles I and II of the convention of November 12th, 1884; having done this, it shall make suitable annotations on the surveys of the boundary line.

### "Article V.

"Whenever the local authorities on any point of the frontier between the United States of America and the United States of Mexico, in that portion in which the Rio Grande and the Colorado River form the boundary between the two countries, shall think that works are being constructed, in either of those rivers, such as are prohibited by Article III of the convention of November 12, 1884, or by Article VII of the treaty of Guadalupe Hidalgo of February 2, 1848, they shall so notify their respective Commissioners, in order that the latter may at once submit the matter to the International Boundary Commission, and that said Commission may proceed, in accordance with the provisions of the foregoing article, to examine the case, and

that it may decide whether the work is among the number of those which are permitted, or of those which are prohibited by the stipulations of those treaties. The Commission may provisionally suspend the construction of the works in question pending the investigation of the matter, and if it shall fail to agree on this point, the works shall be suspended, at the instance of one of the two Governments.

### "Article VI.

"In either of these cases, the Commission shall make a personal examination of the matter which occasions the change, the question or the complaint, and shall give its decision in regard to the same, in doing which it shall comply with the requirements established by a body of regulations to be prepared by the said Commission and approved by both Governments.

### "Article VII.

"The International Boundary Commission shall have power to call for papers and information, and it shall be the duty of the authorities of each of the two countries to send it any papers that it may call for, relating to any boundary question in which it may have jurisdiction in pursuance of this convention.

"The said Commission shall have power to summon any witnesses whose testimony it may think proper to take, and it shall be the duty of all persons thus summoned to appear before the same and to give their testimony, which shall be taken in accordance with such by-laws and regulations as may be adopted by the Commission and approved by both Governments. In case of the refusal of a witness to appear, he shall be compelled to do so, and to this end the Commission may make use of the same means that are used by the courts of the respective countries to compel the attendance of witnesses, in conformity with their respective laws.

### "Article VIII.

"If both Commissioners shall agree to a decision, their judgment shall be considered binding upon both Governments, unless one of them shall disapprove it within one month reckoned from the day on which it shall have been pronounced. In the latter case, both Governments shall take cognizance of the matter, and shall decide it amicably, bearing constantly in mind the stipulation of Article XXI of the treaty of Guadalupe Hidalgo of February 2, 1848.

"The same shall be the case when the Commissioners shall fail to agree concerning the point which occasions the question, the complaint or the change, in which case each Commissioner shall prepare a report, in writing, which he shall lay before his Government."

Prior to the making of the above treaty, there was considerable correspondence between the representatives of the two governments relative to questions as to the applica-

tion of the treaty of 1884 in the true location of the boundary line, and in 1888 Senor Romero inclosed to Mr. Bayard a draft of a convention which was approved by the Mexican government. Senor Romero in the communication expressed the opinion that the appointment of an International Boundary Commission was an indispensable complement of the 1884 treaty.

The following January he inclosed to Mr. Bayard an additional article which appears in the treaty as article VII.

In the note written therewith, Senor Romero wrote: "The object of the treaty proposed by me is the creation of a tribunal to enforce the rules adopted by both Governments in the convention of November 12th, 1884. Without such a tribunal, these rules could not be practically enforced, because, the two Governments having charge of these matters, the settlement of such questions as might arise would be unusually difficult."

In March, 1889, Senor Romero again wrote Mr. Bayard relative to the treaty, suggesting the use of the word "corrosion" instead of "erosion" in the English text, and concluded his note as follows: "It is a cause of satisfaction to me that during the time the Department of State of the United States has been under your charge solid bases have been fixed, not only for the proper marking of the dividing line between the two countries, but also for putting an end, in a friendly manner and by means of proceedings which are to some extent judicial and which therefore afford guarantees of justification and accuracy, to the difficulties arising by reason of the inevitable changes in the channel of the rivers which serve as the boundary for a considerabe part of our frontier line, caused by the force of the current."

Mr. Bayard, in reply, wrote: "It affords me much gratification to reciprocate your expression of satisfaction that our mutual endeavors toward adjusting by competent means all questions between the two countries touching the demarkation of the frontier and toward removing all causes for difference in that regard, have reached a successful close."

This note was written on the day the treaty establishing the Boundary Commission was signed, and in another note bearing the same date, referring to a question which had been under consideration relating to the construction of some wing dams on the Mexican side opposite El Paso, he wrote: "In view of the apparent subjection of the questions presented at Cuidad Juarez to the stipulations of the river-boundary Convention of November 12, 1884, and of the immediate prospect of a convenient forum for their adjustment being afforded as the result of the negotiation for an International Boundary Commission, which we are about to bring to so satisfactory a close today, there seems to be no present occasion for discussing the incident of the obstructions in question; for I assume that those works will continue to be suspended until a harmonious decision can be reached in the premises, —unless indeed all occasion for possible complaint shall be sooner removed by so modifying the plan of operations as to cause its obnoxious features, which Major Ernst reports so clearly and forcibly, to entirely disappear."

Major Ernst, referred to, was an engineer appointed by the United States to, along with an engineer appointed by the Mexican Government, investigate the facts involved.

Mr. Blaine, May 26, 1890, wrote Senor Romero in regard to a question which had arisen over the Banco del Zurron, and, referring to the reply of Senor Mariscal, said:

"It is observed that Senor Mariscal's reply is silent as to the question of fact, and makes no controversy as to the evidence, which was collected by the authorities of Texas, and communicated to your government, to show that the fence in question correctly marks the owners boundary line at the point now in dispute, as it has stood unquestioned for years, as it has been adjudicated by courts, and according to the principles laid down in the Convention of November 12, 1884.

"The verbal criticisms of Mr. Mariscal do not touch the essential question of jurisdiction. As to this latter, I may assume that the Government of Mexico joins issue on the fact, from the invitation put forth to settle the question on the reports of two competent engineers, to be severally appointed by each government to survey the territory in question.

"Such a course, while doubtless affording an opportunity for the collection of additional information upon which to rest a concurrent opinion, would not afford the authoritative determination of the question arising under the convention of November 12, 1884. The subsequent convention signed March 1, 1889, which provides an International Commission to adjudicate this class of questions now only awaits the acceptance by Mexico of the Senate's Amendment and the exchange of ratifications to become effective,—as I have had the honor to state in my note of the 24th instant.

"It would seem advisable, therefore, to leave the examination of the facts to the competent commission, which will doubtless soon be organized, for a determination of the territorial question raised. The individual rights of ownership, of course, form a separable issue, to be determined, the case arising, by the courts of the country having jurisdiction of the soil."

In the year 1894 rules and regulations for the International Boundary Commission were approved by the representatives of the two governments.

The portions thereof, material to the inquiry here, are:

"Article IV.

"The final decision in each case shall be made in duplicate and in both languages, duly signed by both Commissioners and attested by their Secretaries, one copy to be forwarded to each government within three days after signing."

"Article VI.

"If the examination made by the Commissioners or by the Engineers, is not considered sufficient to come to an intelligent decision, the Commissioners may ask testimonial or documentary evidence, appointing sufficient time in each case, taking distance into consideration."

"Article VII.

"The testimony of witnesses shall be taken according to the laws of their respective countries."

"Article VIII.

"The witness may be examined not only by the Commissioner who brings him, but by the other one on all matters pertinent to the general investigation."

In February 1896, Mr. Olney wrote Senor Romero, as follows:

"A report made to this Department on the 15th of January, 1895, by Colonel Anson Mills, Commissioner of the United States under the International Water Boundary Conventions of 1884 and 1889, stated at some length the difficulties which the Mexican Commissioner and himself had encountered in applying the provisions of those conventions to questions affecting the numerous isolated 'bancos' on either side of the present channel of the Rio Grande from El Paso to the sea, and more especially below Rio Grande City. From that point to the Gulf, which is 108 miles in a straight line although over 240 miles when following the river course, the channel passes through alluvial lowlands of such fragile consistency and slight fall, that the stream is subject to constant changes by erosion and accretion, forming curves which eventually become cut off by avulsion and later isolated from the river channel by further accretions. In such cases as that of the Banco de Vela the cession of the river leaves the cut off tract surrounded by domain and people under a different jurisdiction, isolating it completely and raising questions of right of access. In other cases alternate processes of erosion, avulsion and accretion cut away a banco so made and afterwards may again isolate a part of it so that territories open to dispute may in future overlap each other, while the title to the overlapping portion may be coincidently determinable according to the two distinct rules of law laid down in the conventions. The complexity of the problems thus presented and the great time and expense which a determination of the boundaries of each banco would entail upon the two governments, have led the Commissioners to present these facts for the consideration of the respective governments, with a suggestion that they may wish to amend Articles 1 and 2 of the Convention of 1884, so that any banco having less frontage on the river's current than it has depth from the river shall not be considered as an avulsive change as contemplated in the convention, but that in such cases the commission should be authorized to announce the transfer of jurisdiction to the country to which such banco shall be left by the avulsive change. * * *

"I am inclined to think that the recommendations of the Commissioners, reached on the spot, after prolonged examination and consideration of the almost insuperable difficulties in the way of literally and exactly carrying out the provisions of the existing Water Boundary Conventions, are entitled to great weight; and I doubt not that your Government shares in this view. I am inclined also to believe that the proposed amendment of the existing stipulations would be in the interest of fraternity and good will between the two countries, removing occasion for jurisdictional disputes and destroying the frequent opportunities now offered by the isolation of these small areas of alien domain for the operations of evil doers who are alike secure from the operations of the laws of the surrounding territory and enjoy practical immunity from the enforcement of the laws of the country to which such bancos now belong.

"It has seemed to me, therefore, expedient to invite the attention of your Government to the matter by submitting a tentative draft of an amendatory convention embracing a single article framed in accordance with the recommendations of the International Water Boundary Commissioners."

In January, 1898, Senor Romero wrote the following note to Mr. John Sherman:

"I have the honor to inform you that I have received a communication from Senor Mariscal, Secretary of Foreign Relations of the United States of Mexico, dated the City of Mexico, the 29th of December last, giving the reasons which influenced the Government of Mexico to withhold its approval of the decisions of the International Water Boundary Commission as set forth in the protocol of the 27th of November last in regard to changing the jurisdiction over the bancos, and in the last clause of the 8th paragraph in regard to the inclusion of bancos according to their dimensions, also in the protocol of the 3d of December following concerning the channel of the Rio Grande at El Paso—to which I referred in the note which I addressed to you on the 25th ultimo.

"These reasons are that in the 7th paragraph of the protocol of the 27th November it is said that 'the engineers must, moreover, support full reports in order that the Commission may change the jurisdiction from one·

country to the other.' The Government of Mexico thinks that probably the Commission wished to refer to the authority which, under the treaty, it has for examining the cases submitted to it, and to propose to the two Governments what may be considered proper for determining upon changes of jurisdiction; but as the language in which this idea is expressed in this cited paragraph gives one to understand that the commission attributes to itself the authority to 'change the jurisdiction from one country to another'—which is contrary to the international agreement that created it—the Government of Mexico has deemed it necessary not to approve the part of the protocol to which I have referred, while it is not modified in proper terms.

"In regard to the last clause of the 8th paragraph, of the same protocol, I must state to you that the Mexican Government not deeming satisfactory the explanations which up to this time have been given relative to the determination of form and dimensions of the so-called bancos, for their inclusion in the contiguous territory, neither can it approve that part of the paragraph because it treats of a point submitted to fresh examination for definite determination upon a modification of Articles I and II of the treaty of the 12th of November, 1884.

"The Government of Mexico is not empowered to cede any portion of Mexican territory, not even when, as is stated in the protocol of the Commission of December 3d, last, the land may be of a particular kind and it may be wished to cede it; and for this reason the Mexican Government has refused to approve the part of the protocol to which I refer.
* * *"

In June, 1898, Mr. Moore wrote Senor Romero, notifying him that the government of the United States had accepted the amended journals referred to in the above.

Then followed considerable correspondence between the state departments of the two governments relative to the execution of a treaty eliminating bancos, Mexico seeking more data before being willing to enter into negotiations, and the American representatives requesting action.

In May, 1899, Senor Mariscal wrote Mr. McCreedy, as follows:

"I had the honor to receive your notes of the 21st and 28th ultimo, and with the second a copy, elegantly bound, of the report of the proceedings of the International Boundary Commission, a present which I much appreciate. In both notes, under instructions from the Government which you represent, you recommend, with the urgency proper in the case, a definite decision as to the elimination or nonelimination of the bancos which, owing to natural causes, have been formed in that part of the Bravo between the points of affluence of the Rio Verde and its mouth in the Gulf

of Mexico, as graphically represented in the four sheets of photographic copy.

"I have laid your communication, and all matter relating to the case, before the President of the Republic, and by his direction I have the honor to inform you that Mexico, like the United States, is decidedly in favor of the elimination of the bancos, judging it to be the only way to avoid questions of sovereignty and jurisdiction. Under the old and accepted system which we have applied to the Bravo, that of using rivers to define frontier boundary, it must be accepted as an invariable basis that one bank belongs to one country and the bank opposite to the other. The actual boundary, where the bancos are situated, interferes with the application of this basis, and therefore, nothing is better than to eliminate, granting that it is not only possible but easy, the elements which interfere with it.

"This principle being accepted, it remains to adopt the form of applying it, and there can be no other form than that of the diplomatic convention.

"Documents with which you are perfectly familiar propose and prepare the way for it, they are: the Proceedings of the International Boundary Commission of January 15, 1895, of November 27, 1897, and of June 14, 1898, and the draft of the treaty submitted by the Honorable Mr. Olney to the representative of Mexico in Washington on February 29, 1896.
* * *

"I have the honor, therefore, by direction of the Chief Magistrate, to propose to you that our Governments carry it into effect on the following basis, which you will please submit, if you think it proper, to your Government: Clear and exact reference to the topography, with designation by name of the bancos to be eliminated, and also the articles of prior treaties which are in conflict with the principle of the elimination of bancos, and which, therefore, should be modified; foreseeing future changes in the course of the Bravo, and for a decision in view of them, to prorogue the International Commission for a prudent period. Lastly, the convention will have to establish rules relative to citizenship, property and servitudes on the bancos in question, in order that these rights may not be affected by the change of sovereignty and jurisdiction."

In November, 1899, Mr. Hay wrote to Mr. Clayton inclosing a draft of the proposed treaty intended to meet the suggestions of Senor Mariscal. After the question had been presented to Senor Mariscal, he, in December, 1899, wrote to Mr. Clayton, as follows: "As I had the honor to say verbally to Your Excellency, in regard to the project of a treaty in the matter of the bancos of the river Bravo, there arises a grave constitutional question which requires profound and long study: that of the lack of power on the part of this gov-

ernment to cede portions, limited though they may be, of the Mexican territory."

In reply to this question, Mr. Hay, in 1894, wrote Mr. Clayton: "Regarding the grave constitutional question suggested in Mr. Mariscal's note to you of December 22, 1899, the Department is of the opinion that you might suggest that as the sovereignty of the bancos in question proposed to be eliminated is in dispute it could hardly be construed as a ceding of Mexican territory, but rather the fixing of the boundary separating territory, the sovereignty of which is questionable, which is a power understood to be assumed by nations in similar questions, and one which is generally referred for adjudication to commissions like the one now having the question under consideration and only requiring the approval of the treaty-making powers of the Countries involved to make its results effective and binding upon both the contracting parties."

After Mr. Clayton had taken the matter up with Senor Mariscal, Senor de Aspiroz wrote Mr. Hay informing him that he had full powers to proceed with the negotiation of the treaty, and inclosing a copy of a proposed draft thereof by Senor Mariscal.

The draft prepared by Senor Mariscal was approved by Mr. Hay, with one alteration, which has no bearing on the question involved in this case. The change was approved by Mr. Aspiroz, and a treaty was signed March 20, 1905 (35 U. S. Stat. 1863). The material portions thereof are:

#### "Article I.

"The fifty-eight (58) bancos surveyed and described in the report of the consulting engineers, dated May 30, 1898, to which reference is made in the record of proceedings of the International Boundary Commission, dated June 14, 1898, and which are drawn on fifty-four (54) maps on a scale of one to five thousand (1 to 5,000), and three index maps, signed by the Commissioners and by the Plenipotentiaries appointed by the convention, are hereby eliminated from the effects of Article II of the Treaty of November 12, 1884.

"Within the part of the Rio Grande comprised between its mouth and its confluence with the San Juan River the boundary line between the two countries shall be the broken red line shown on the said maps—that is, it shall follow the deepest channel of the stream —and the dominion and jurisdiction of so many of the aforesaid fifty-eight (58) bancos as may remain on the right bank of the river shall pass to Mexico, and the dominion and jurisdiction of those of the said fifty-eight (58) bancos which may remain on the left bank shall pass to the United States of America.

#### "Article II.

"The International Commission shall, in the future, be guided by the principle of elimination of the bancos established in the foregoing article, with regard to the labors concerning the boundary line throughout that part of the Rio Grande and the Colorado River which serves as a boundary between the two nations.

"There are hereby excepted from this provision the portions of land segregated by the change in the bed of the said rivers having an area of over two hundred and fifty (250) hectares, or a population of over two hundred (200) souls, and which shall not be considered as bancos for the purposes of this treaty and shall not be eliminated, the old bed of the river remaining, therefore, the boundary in such cases.

#### "Article III.

"With regard to the bancos which may be formed in future, as well as to those already formed but which are not yet surveyed, the Boundary Commission shall proceed to the places where they have been formed, for the purpose of duly applying Articles I and II of the present convention, and the proper maps shall be prepared in which the changes that have occurred shall be shown, in a manner similar to that employed in the preparation of the maps of the aforementioned fifty-eight (58) bancos.

"As regards these bancos, as well as those already formed but not surveyed, and those that may be formed in future, the Commission shall mark on the ground, with suitable monuments, the bed abandoned by the river, so that the boundaries of the bancos shall be clearly defined.

"On all separated land on which the successive alluvium deposits have caused to disappear those parts of the abandoned channel which are adjacent to the river, each of the extremities of said channel shall be united by means of a straight line to the nearest part of the bank of the same river.

#### "Article IV.

"The citizens of either of the two contracting countries who, by virtue of the stipulations of this convention, shall in future be located on the land of the other may remain thereon or remove at any time to whatever place may suit them, and either keep the property which they possess in said territory or dispose of it. Those who prefer to remain on the eliminated bancos may either preserve the title and rights of citizenship of the country to which the said bancos formerly belonged, or acquire the nationality of the country to which they will belong in the future.

"Property of all kinds situated on the said bancos shall be inviolably respected, and its present owners, their heirs, and those who may subsequently acquire the property legally, shall enjoin as complete security with

respect thereto as if it belonged to citizens of the country where it is situated."

We have quoted at length from the treaties and correspondence for the purpose of showing the history of the conditions which confronted the two countries at the time the last quoted convention was negotiated and the intention of the representatives at such time.

In a logical discussion of the case, it seems the first question to be decided is whether the Treaty of 1905 was intended as a cession of territory from each of the governments to the other, or was, as asserted by appellees, merely the readjustment of a boundary line between the territories of the two governments.

It appears from the correspondence between the two governments, that above quoted, as well as that which we have not consumed the space to include, that a great amount of difficulty was encountered in attempting to apply the principles of the treaty of 1884. This led to the creation of the Boundary Commission, which, it seems, was created for the purpose of ascertaining the facts as to whether the changes had been brought about as a result of avulsion or erosion.

It can readily be seen from the report of Col. Anson Mills, referred to in Mr. Olney's note to Senor Romero, February, 1896, above quoted, that even the Boundary Commission had found it practically impossible to ascertain the true facts relative to some of the changes which had occurred in the bed of the Rio Grande.

These conditions, it is revealed by the correspondence during that time, brought about numerous and sundry disputes between not only the citizens of the two countries, but also led to threatened clashes between the officials thereof.

The state departments were continuously in correspondence relative to some dispute arising as to the actions of some of their citizens or officials, on lands over which the jurisdiction was questioned.

In order to put an end to these questions and to prevent their arising in the future, the state departments decided that the only way this could be accomplished, under the facts recited by the report of the Boundary Commission, was to eliminate the bancos, and this they did in the treaty of 1905. While the negotiations were in progress, one of the questions which deterred the Mexican state department from agreeing to make such a treaty was the fact that the Mexican government could not lawfully cede any portion of its territory. This obstacle was removed by Mr. Hays' note to Mr. Clayton in 1894, or, at least, Senor Mariscal appears to have concluded that Mr. Hays' suggestion had that effect, for immediately thereafter he agreed that the treaty should be made, and presented a proposed draft therefor.

The treaty of Guadalupe Hidalgo provided that the boundary line by it established should not be changed "except by the express and free consent of both nations, lawfully given by the General Government of each, in conformity with its own constitution," and the pleading of appellant reveals that the Constitution of Mexico emphatically prohibits the cession of any of its territory.

It needs no citation of authorities to support the rule that in construing contracts, where one construction will make it legal and another will make it contrary to law, the former will be adopted; and that the courts must, if possible, ascertain and give effect to the mutual intention of the parties.

Having in mind the intention of the parties as evidenced by the correspondence, and in accordance with the foregoing well-established rules of construction, we have concluded that the purpose of the treaty of 1905 was the readjustment of the boundary line, and was not intended to operate as a cession of territory.

In the case of Coffee v. Groover, 123 U. S. 1, 8 S. Ct. 1, 6, 31 L. Ed. 51, the Supreme Court of the United States had before it a question of the rights of individuals in territory involved in claims arising out of a boundary dispute between the States of Georgia and Florida. It appears that there were three distinct lines, each claimed to be the true boundary between the states, to wit, the "Watson," "McNeil," and "Orr and Whitner" lines. The Watson line was the most southerly, the McNeil line the next to the north, and the Orr and Whitner line still farther north. The land in dispute in the suit was situated between the Watson and McNeil lines. The two states finally agreed that the Orr and Whitner line was the correct one. Georgia had, however, while still claiming to the Watson line, granted the land in question to Groover, while Coffee claimed the land under title from Florida. The court, after having pointed out that private individuals were entitled to have their rights respected in cases where territory was conquered, said: "But while this is the acknowledged rule in cases of ceded, and even conquered, territory, with regard to titles acquired from a former sovereign who had undoubted right to create them, it does not apply (as we shall see) to cases of disputed boundary in relation to titles created by a sovereign in possession, but not rightfully so. In the latter case, when the true boundary is ascertained, or adjusted by agreement, grants made by either sovereign beyond the limits of his rightful territory, whether he had possession or not (unless confirmed by proper stipulations), fail for want of title in the grantor. This is the general rule."

The court held that the claimants under the Georgia title never had any rights in the lands.

The above case was cited with approval by the Supreme Court of Texas in Kenedy Pasture Co. v. State of Texas, 111 Tex. 200, 231 S. W. 683, 691. The court said: "In cases of disputed territory, when the true boundary is ascertained or adjusted by agreement, grants made by the unlawful sovereignty in the territory to which as thus ascertained it had no right, whether it had possession at the time of the grants or not, unless confirmed by express agreement, fail and are of no effect against the sovereignty to which the territory of right belonged. They fail simply because of want of title in the grantor. A de facto possession cannot supply the title. These principles are well established and are a part of the accepted law of nations."

In the first case Georgia was in actual possession and exercising jurisdiction over the territory at the time the grant was made, while in the second case the contention was made that the rights of appellant's predecessor in title arose while Mexico was in possession and exercising jurisdiction over the territory in which the land was located.

The question of de facto possession of Mexico over the land here in dispute is not present, but we are of the opinion that the doctrine announced by the highest courts would certainly apply in the case before us, and that, under the facts here, no rights arising by virtue of a grant from Mexico could arise, unless they were expressly reserved by the treaty of 1905.

Article 4 of the treaty contains the following provisions as to the property rights on the eliminated bancos: "Property of all kinds situated on the said bancos shall be inviolably respected, and its present owners, their heirs, and those who may subsequently acquire the property legally, shall enjoy as complete security with respect thereto as if it belonged to citizens of the country where it is situated."

We are of the opinion that the purpose of the above stipulation was intended to protect only those then having rights in the property, their heirs, and those claiming under them, and could not, by any reasonable construction, be extended to include those claiming title thereto based upon a subsequent grant from Mexico.

It follows that appellant here has not alleged a sufficient title upon which to base an action of trespass to try title, and the action of the trial court in sustaining the general demurrer should, upon this ground, be sustained.

Appellant, in a supplemental brief, contends that the jurisdiction of the court of first instance cannot be assailed because of the provisions of paragraph 1 of article 5 of the Treaty of 1884, above quoted, providing that the rights of property in respect of lands separated through the creation of new channels should not be affected thereby, and that such lands should remain under the jurisdiction of the country to which it previously belonged.

Appellant also refers us to the second paragraph of the same article as explanatory of the first paragraph. It reads: "In no case, however, shall this retained jurisdictional right affect or control the right of navigation common to the two countries under the stipulations of Article VII of the aforesaid Treaty of Guadalupe Hidalgo; and such common right shall continue without prejudice throughout the actually navigable main channels of the said rivers, from the mouth of the Rio Grande to the point where the Rio Colorado ceases to be the international boundary, even though any part of the channel of said rivers, through the changes herein provided against, may be comprised within the territory of one of the two nations."

It cannot be successfully disputed that the lands on bancos formed continued under the jurisdiction of the country from which they had been separated by avulsion under the provision referred to, but we are of opinion that such provision was modified by the provisions of the Convention of 1905. As stated by Senor Mariscal in his letter to Mr. McCreedy in May, 1899: "I have the honor, therefore, by direction of the Chief Magistrate, to propose to you that our Governments carry it into effect on the following basis, which you will please submit, if you think it proper, to your Government: Clear and exact reference to the topography, with designation by name of the bancos to be eliminated, and also the articles of prior treaties which are in conflict with the principle of the elimination of bancos, and which, therefore, should be modified; foreseeing future changes in the course of the Bravo, and for a decision in view of them, to prorogue the International Commission for a prudent period. Lastly, the convention will have to establish rules relative to citizenship, property and servitudes on the bancos in question, in order that these rights may not be affected by the change of sovereignty and jurisdiction."

It thus appears that the parties recognized the necessity for a modification of the provisions of previous treaties which were in conflict with the principle of elimination of bancos.

One of these provisions, of course, was the one to which appellant refers, for the jurisdiction could not continue in the country from which it had been cut off and at the same time pass to the other country. As suggested by Mr. Mariscal, the Treaty of 1905 contained provisions relative to citizenship, property, and servitudes on the bancos, in order

that those rights should not be affected by the change of sovereignty and jurisdiction. Article 4.

Our conclusion, we think, would still be true, regardless of the fact that the representatives of the two governments in 1930, through their correspondence, agreed to an interpretation of the treaty to the effect that the transfer of sovereignty should take place one month from the date the Commission gave its decision, unless such decision should meanwhile be disapproved by either government.

■ If these representatives construed the treaty as one of cession, then such construction, from what has been heretofore said, was in conflict with the plain intention of the representatives who negotiated the treaty, and cannot here be given the effect of changing such purpose and intention.

■ If it be conceded that the treaty was one of cession, then, we think, the de jure sovereignty of the existing bancos passed to the respective countries at the time the treaty was signed, while the de facto sovereignty might remain in the ceding sovereign until the territory was actually delivered; that is to say, the United States of Mexico might have retained possession of San Lorenzo banco for strictly municipal purposes—to preserve the public order, the settlement of disputes between individuals, and the like —and this may have been the sovereignty to which the representatives referred in 1930. If, however, we give the treaty the construction contended for by appellant, we still must conclude that no rights are here shown which would entitle appellant to maintain an action of trespass to try title. The treaty certainly conveyed to the United States the equitable title to all bancos on the north side of the river coming within its provisions, and, having done so, Mexico had no power to grant land thereon, after the treaty was signed. As said in the Kenedy Pasture Co. v. State of Texas, supra: "But after the signing of the treaty its powers of sovereignty except strictly for those purposes [referring to the power to preserve public order, the settlement of disputes between individuals and the like], cease. It distinctly has no power to grant land or franchises. Such a power is one of the highest attributes of sovereignty, and its exercise would necessarily operate as a denial of the rights of the succeeding sovereignty."

The court cited in support of this principle Davis v. Police Jury, etc., 9 How. 280, 293, 13 L. Ed. 138, and Trevino v. Fernandez, 13 Tex. 664.

In Davis v. Police Jury, etc., the question involved was the validity of a franchise to operate a ferry at the post of Concordia, opposite the town of Natchez, as a privilege attached to the plantation the grantee possessed. This grant was made four months after the treaty of St. Ildefonso was made by which Spain retroceded to France the province of Louisiana. The court, after citing the opinion of Sir William Scott, in the case of The Fama, 5 Robinson's Admiralty Reports 106, said: "And when previously speaking of what passes full sovereignty in territory acquired by treaty, his test of union of possession and right to constitute full sovereignty excludes the idea of its entire continuance in a government which, having had both, had parted with its right to another, with a concomitant obligation to deliver the possession. In fact, the full sovereignty in such a case is not in one or the other of the contracting parties, but in both, for either to do whatever is essential to the preservation of the ability of each to consummate their contract, according to its terms. * * *

"Finally, all of our proceedings respecting Louisiana have been done upon the principle, that the law of nations does not recognize in a nation ceding a territory the continuance of supreme power over it after the treaty has been signed, or any other exercise of sovereignty than that which is necessary for social order and for commercial purposes, and to keep the cession in an unaltered value, until a delivery of it has been made."

In United States v. D'Auterive et al., 10 How. 609, 623, 13 L. Ed. 560, the court held that the obligation of treaties, unless suspended by some condition or stipulation contained in the treaty, commenced with the execution thereof by the authorized agents of the contracting parties; that the subsequent ratification by the principals themselves had relation to the period of signature, and that any act or proceeding between the signing and the ratification of a treaty, by either of the contracting parties, in contravention of its stipulations, would be a fraud upon the other party and could have no validity consistent with a recognition of the compact itself.

The court said: "As a regular corollary from these principles, and as deducible from the law of reason and the law of nations, it was ruled in the cases just mentioned, that a nation which has ceded away her sovereignty and dominion over a territory could with respect to that territory rightfully exert no power by which the dominion and sovereignty so ceded would be impaired or diminished."

If it be true that nations are unauthorized to change the status of the territory between the signing and the ratification of a treaty (and such a rule seems to be founded on justice and reason), then how can it be contended that a nation, after signing a treaty agreeing to cede certain of its territory to another nation, at a future date, can divest itself of

the title thereto and vest the same in one of its citizens?

■ Much is said in the briefs of the parties relative to the powers of the International Boundary Commission; appellant contending that the Boundary Commission was not intended as a purely ministerial body, but was vested with a broad discretion, having functions to perform which were at least quasi judicial, that the treaty of 1905 was not wholly self-executing, but left much to the determination of the Boundary Commission, and that sovereignty was not intended to pass until the Boundary Commission had determined whether a banco existed, and, if so, had determined its boundaries; appellees, on the other hand, contending that it is merely a commission, the American part of which is under the state department and not a part of the judicial system of the nation, and is not a court in any sense.

We have carefully studied the correspondence and the provisions of the different treaties, and, without setting them forth in this opinion, have concluded that the International Boundary Commission was merely a fact-finding body, and had no judicial functions other than to examine into and make findings as to facts, which finding it was agreed would be final, unless disapproved within thirty days.

As we understand the Treaty of 1905, it was merely an agreement on the part of Mexico to withdraw any claim to all bancos on the north side of the river, containing not to exceed 250 hectares and not having more than 200 souls, and a like agreement by the United States as to similar bancos on the south side.

Fifty-eight of those bancos had been surveyed and mapped, but there were others then existing which had not been, and the parties, from their knowledge of what had happened in the past, knew that others would be formed in the future.

The parties to this agreement being governments, the only way in which the area and population of the then existing bancos and those to be formed in the future could be ascertained was through agents, and the most natural thing for them to do under such circumstances was to agree that the Boundary Commission, which had already been created, should go upon the ground and ascertain the facts upon which their withdrawal of claim depended.

■ If we be correct in this, then the finding of the facts which placed the San Lorenzo banco within the stipulations of the treaty related back to the date of its execution. The treaty did not confer upon the Commission the power to decide which bancos should and should not be eliminated, but the treaty itself decided that question. If the treaty had empowered the commission to go upon the ground, hear evidence, and decide whether the facts as they found them made elimination advisable, we might have a different question, but here nothing was left to be decided except the presence of the facts which would call for the elimination as provided in the treaty.

Appellant's petition contains general allegations in trespass to try title, and then alleges certain facts as to the existence of San Lorenzo banco, the petition of Urias to have the land adjudged vacant land, the judgment in the court of first instance and a sale to Urias; but contains no allegation showing the transfer of the title from Urias to appellant.

Under the holding in Herndon v. Hayter, (Tex. Civ. App.) 28 S.W.(2d) 885, the lack of such an allegation in itself would render the petition subject to a general demurrer, if appellant was, after pleading generally, attempting to plead his title specially.

We think the petition was probably subject to such a construction, but, there being some doubt about the matter in our minds, and on account of the fact that we feel the demurrer was properly sustained on other grounds, we do not deem a decision of the question necessary.

■ We are also of the opinion that the proceeding in the court of first instance was a special proceeding, and as such it was necessary to plead and prove every step necessary to perfect the title in Urias. Such a rule prevails as to titles founded upon special proceedings in this state. While we deem it unnecessary to here enter into a discussion of the defects which appellees claim were fatal to the validity of that judgment, yet we are of the opinion that appellant's allegations are insufficient to show a strict compliance with the provisions of the Mexican law which it also sets out in its petition.

We have concluded that the general demurrer was properly sustained for the following reasons: (1) That the purpose of the Treaty of 1905 was the adjustment of the boundary line between the United States and Mexico, and that San Lorenzo Banco is therefore assumed to have always been in the United States; and (2) that, even if the treaty was one of cession, neither the republic of Mexico, nor any political subdivision thereof, could rightfully change the status of the title after the treaty was ratified by it.

The judgment of the trial court is affirmed.

J. M. CALDWELL and GOWAN JONES, Special Associate Justices, concur.

J. M. CALDWELL and GOWAN JONES were Special Associate Justices appointed by Governor Sterling to fill the places of associate Justices HIGGINS and WALTHALL, who were disqualified.

On Rehearing.

PELPHREY, C. J.

Appellant, in its motion for rehearing, has called our attention to the fact that on page 17 of our opinion we have quoted a portion of a letter from Senor Mariscal to Mr. Clayton, written in December, 1899, and have thereafter quoted part of a letter in reply thereto from Mr. Hay to Mr. Clayton, and giving the year in which it was written as 1894. In this date we were in error, the correct date of the letter from Mr. Hay to Mr. Clayton being December, 1904. Our former opinion is accordingly corrected so as to have the date of such letter read 1904 instead of 1894; the motion for rehearing, except as to the above correction, being in all things overruled.