## WILLIS v. FIRST REAL ESTATE & INV. CO. et al.

### No. 6810.

Circuit Court of Appeals, Fifth Circuit.

Jan. 24, 1934.

E. F. Cameron, Fred C. Knollenberg, and Sydney Smith, all of El Paso, Tex., for appellant.

672

Wm. H. Burges, A. H. Culwell and Paul D. Thomas, all of El Paso, Tex., for appellees.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This is one of a series of test cases brought by claimants under a Mexican title against those in possession under a Texas title to lands on the Texas bank of the Rio Grande. The Mexican title is based on a libel filed by one Urias in 1926, a decree adjudicating the property to be vacant, and an act of sale to Urias culminating August 31, 1927, all, as plaintiff claims, according to the provisions of the Civil Code of the state of Chihuahua, Mexico.

The Texas title rests on a patent from the state of Texas in 1861. Judgments for defendants in three of the cases tried were affirmed in the Eighth Court of Civil Appeals at El Paso.[1] In the opinions, the petition, the boundary treaties between Mexico and the United States of 1848, 1853, 1884, and 1905 (9 Stat. 922; 10 Stat. 1031; 24 Stat. 1012; 35 Stat. 1863), the official correspondence, and the proceedings of the boundary commissions are fully shown. We shall not burden this opinion with setting them out, referring instead to those opinions for the complete text. By these suits, brought in American courts having jurisdiction only over Texas lands, plaintiffs affirmed that the land was a part of Texas and within the political and territorial jurisdiction of courts sitting there, and yet, in each case, the plaintiff asserts a title the validity of which depends upon a finding that when it originated, the land was actually within the political and territorial jurisdiction of Mexico, and fully subject to the act of sovereignty in which plaintiff's title roots.

The apparent inconsistency of plaintiff's position in asserting in an American court against a Texas title emanating in 1861, a Mexican title originating in 1927, is clarified by the statement of plaintiff's claim that though the land is now by the operation of the boundary treaty of 1905[2] between the United States and Mexico a part of Texas, it has been so only since 1930 when the boundary commission found the land to be a "banco" within the terms of that treaty.

That though before 1930 the land had been attached to the soil of Texas, this attaching, as conclusively found by the commission, had taken place by an avulsive change in 1898; that therefore under articles 1, 2, and 5 of the Treaty of 1884[3] and under the principles of international law, Iowa v. Illinois, 147 U. S. 1, 13 S. Ct. 239, 37 L. Ed. 55; Arkansas v. Tennessee, 246 U. S. 158, 38 S. Ct. 301, 62 L. Ed. 638, L. R. A. 1918D, 258; Louisiana v. Mississippi, 282 U. S. 458, 51 S. Ct. 197, 75 L. Ed. 459, it was in 1927 and until 1930 Mexican territory, and subject to Mexican law.

In support of this position plaintiff pleaded, offered in evidence and relied upon, the boundary Treaty of 1884,[4] that of 1905, the correspondence between the two governments interpreting the Treaty of 1905 as providing for a transfer of sovereignty one month after the commission's decision,[5] the proceedings before the Mexican court in Juarez, Mexico,[6] and the findings of the boundary commission in 1930.[7] The defendants maintained that the land had never been a part of Mexican soil. They planted themselves firmly upon the proposition that long before 1848 it had been a part of the territory of the Texas Republic, and that in that year, by the Treaty of Guadalupe Hidalgo[8] between Mexico and the United States fixing

---

[3] Article 1: "The dividing line shall forever be that described in the aforesaid Treaty and follow the centre of the normal channel of the rivers named, notwithstanding any alterations in the banks or in the course of those rivers, provided that such alterations be effected by natural causes through the slow and gradual erosion and deposit of alluvium and not by the abandonment of an existing river bed and the opening of a new one."

Article 2: "Any other change, wrought by the force of the current, whether by the cutting of a new bed, or when there is more than one channel by the deepening of another channel than that which marked the boundary at the time of the survey made under the aforesaid Treaty, shall produce no change in the dividing line as fixed by the surveys of the International Boundary Commissions in 1852; but the line then fixed shall continue to follow the middle of the original channel bed, even though this should become wholly dry or be obstructed by deposits."

Article 5: "Rights of property in respect of lands which may have become separated through the creation of new channels as defined in Article II hereof, shall not be affected thereby, but such lands shall continue to be under the jurisdiction of the country to which they previously belonged."

[4] San Lorenzo Title & Improvement Co. v. Clardy (Tex. Civ. App.) 48 S.W.(2d) 315, 319, 320.

[5] San Lorenzo Title & Improvement Co. v. Clardy (Tex. Civ. App.) 48 S.W.(2d) 315, at page 327.

[6] San Lorenzo Title & Improvement Co. v. Clardy (Tex. Civ. App.) 48 S.W.(2d) 315, at page 317.

[7] San Lorenzo Title & Improvement Co. v. City Mortgage Co. (Tex. Civ. App.) 48 S.W.(2d) 310, at page 312.

[8] San Lorenzo Title & Improvement Co. v. Clardy (Tex. Civ. App.) 48 S.W.(2d) 315, at page 318.

---

[1] San Lorenzo Title & Improvement Co. v. City Mortgage Co., 48 S.W.(2d) 310; San Lorenzo Title & Improvement Co. v. Clardy, 48 S.W.(2d) 315; San Lorenzo Title & Improvement Co. v. Caples, 48 S.W.(2d) 329.

[2] San Lorenzo Title & Improvement Co. v. Clardy (Tex. Civ. App.) 48 S.W.(2d) 315, at page 324.

the Rio Grande as a boundary, it had been recognized to be a part of Texas soil. They contended and offered proof in support, that it was then on the north side of the river, and except for a short period between 1897 and 1898, it has always been on the north side. They proved that in 1897 as the result of a temporary avulsive change in a freshet, the river for a short time ran north of the banco, only in 1898 to change its course avulsively again, to run south of it where for more than fifty years it had been running. They maintained by pleading and by proof which was not in any wise contradicted, that the territory has been a part of Texas by actual location since 1848. They showed that by the uninterrupted assertion of jurisdiction over it Texas has always maintained its rights of sovereignty there both de facto and de jure. Over the objection of plaintiff that the evidence contradicted the binding effect of the Treaty of 1905 and the finding of the commission under it, that the property was Mexican territory in 1898, they offered the 1861 patent from the state of Texas, a continuous chain of title down to the present defendants, proof of tax payments, the uninterrupted assertion of civil and criminal jurisdiction over the land by Texas, the authorized possession and settlement of it under Texas title by many American citizens for many years.[9]

This proof is not controverted, except in so far as the finding of the boundary commission that the land was cut from Mexico in 1898 may be considered to controvert it. On the strength of it, defendants maintained, and the District Judge found, that the vacant land proceedings in Mexico were void for want of jurisdiction over the land, it being de jure and de facto a part of the state of Texas. As to the March 21, 1930, findings of the boundary

commission,[10] on which plaintiff relies as conclusively establishing that the San Lorenzo banco was in 1927 Mexican territory, defendants say: (1) That they are not in conflict with the findings of fact of the District Court, they are not intended to be more than a finding that within the contemplation of the Treaty it should because of its being on the Texas side and of the undoubted fact that an avulsive change did occur in 1898, and of all the facts and findings since, be treated and held as a "banco." (2) That if the finding of the commission is intended to be that the land was prior to 1898 Mexican territory, this finding, by the terms of article 4 itself of the Treaty of 1905 (35 Stat. 1867) [11] is effective only as between the governments, and is without effect upon private interests and titles. (3) That if the findings of the commission do have the effect in a private controversy over titles to land of conclusively establishing that prior to 1898 the property was Mexican territory, the findings operate to destroy, rather than to support,

[9] In the proceedings of the boundary commission there appeared in the report of the commission's engineers dated October 2, 1924, that at the hearings before the commission in 1907 the claim had been made that the San Lorenzo banco had always been American territory "as the movement made by the river in 1898 had been inverse to the one in 1897 which had left this land on the Mexican side of the river temporarily." That report also contained this statement: "As noted November 1924 the number of inhabitants totaled 325; the 1905 Convention specifies 200 inhabitants as the limit in number for the elimination of bancos. However, at the time the banco was segregated from Mexico, there were no inhabitants on that land. Those that have established themselves there since have done so bona fide during the period of inactivity of the International Boundary Commission, this land being now extension of the City of El Paso, known as Collingsworth Addition and Alameda Acres. Therefore we are of opinion that the socalled banco of San Lorenzo is a banco subject to elimination in accordance with the spirit of the 1905 Treaty."

[10] These findings, after reciting the appearance of interested persons offering testimony of avulsive changes in the river, that it had had before it for inspection and study the surveys made by consulting engineers for previous boundary commissions, adopted and made a part of their findings, the report of their present consulting engineers. This report set out the decision of the boundary commission in 1898 that the land was a typical banco, that the claim of an avulsion in 1897 prior to that of 1898 had been advanced, various maps showing the location of the channel at different times, their conclusion that from 1889 to 1898 the river ran around the banco, and their final conclusion that the banco was cut from Mexico in 1898 and is subject to elimination as set out under the Treaty of 1905. The findings then continued:

"The records show that during the floods in the Rio Grande of July 1898 a tract of land known as the 'Bosque del Real de San Lorenzo' was segregated from Mexican territory. The then American Boundary Commissioner, in a meeting held December 19, 1898, stated that in his opinion the case concerned a typical banco. On December 23, 1907 the then Consulting Engineers of both sections of the International Boundary Commission reported that a careful consideration of all the evidence showed that a true avulsive change occurred in 1898, and that as a result the banco was formed, coming under the treaty of 1905."

The commissioners, giving full consideration to the acquired and presented data, adopted the following resolution: "The tract of land known as San Lorenzo Banco, numbered 302 described in the report of the Consulting Engineers dated March 19, 1930, and shown on the accompanying map, cut from Mexico in 1898, and which remains on the left and north side of the Rio Grande, is hereby eliminated from the effects of article II of the Treaty of November 12, 1884, and the dominion and jurisdiction of this banco shall pass to the United States of America, in accordance with the provisions of the Treaty of March 20, 1905, for the elimination of bancos."

[11] "Property of all kinds situated on the said bancos shall be inviolably respected, and its present owners, their heirs, and those who may subsequently acquire the property legally, shall enjoy as complete security with respect thereto as if it belonged to citizens of the country where it is situated."

plaintiff's claim. They establish with equal conclusiveness that since 1898 it has been actually settled upon and possessed as such under a Texas title and attached to Texas territory, and since 1905, under the terms of the Treaty, it has been a part of Texas soil. (4) That if the findings of the commission and the Treaty operate as contended by plaintiff, to determine as to this private dispute, that the property was until March 21, 1930, de jure Mexican territory, this will not advantage plaintiff either. For the findings make it perfectly clear that the property was, and had been for more than thirty years, de facto within the territory of the United States. Had been settled upon by citizens living there and claiming under a Texas title. It was therefore so withdrawn from and so wholly outside of the effective jurisdiction of Mexico, as that rights of persons in possession under claim of title could not be affected by vacant land proceedings under Mexican law no matter how precisely undertaken and carried out. (5) That if it be considered that the Treaties of 1884 and 1905 and the proceedings under them had the effect of establishing that the land was in 1927 Mexican territory over which their courts could exercise their lawful jurisdiction, the proceedings taken in the Juarez court fail for want of an affirmative showing in the record of the jurisdictional facts necessary to sustain such a special proceeding. They fail too because the record shows on its face that the facts necessary for jurisdiction of a vacant land proceeding under the Chihuahua Code never existed, and that jurisdiction was never acquired.

While we think the defendants are right in their second position that the findings of the commission had no binding effect upon private rights, and that it was for the District Court to determine on the evidence before it the facts as to the location of the land in controversy and adjudicate accordingly and that the evidence amply sustains his finding that the property has always been in Texas, we think it proper to briefly present our views upon the whole case.

We have examined the Treaties of 1884 and 1905, and the correspondence preceding and following the Treaty of 1905[12] in the light of the erratic action of the river in so making its changes as to make it difficult, if not impossible, for the boundary commission proceeding under article 4 of the Treaty of 1884 to say whether a true avulsion under article 2 or a mere erosion under article 1 had occurred, and in the light of the great difficulties inherent in the attempt of one country to exert sovereignty over land attached to the other across the boundary. We are left no doubt as to the paramount purpose, intent and effect of the Treaty of 1905. It was to change the international boundary from the shifting and troublesome one provided for in articles 1 and 2 of the old Treaty to the fixed one established by the 1905 Treaty. It was to fix the territory of and sovereignty over all bank lands in accordance with their actual situation on the left or the right bank as thus fixed. It is clear, also, we think, that the function of the boundary commission was to set at rest, not by way of cession, but by way of a definitive boundary decision as to all banco lands, that is, lands which had been affected by avulsive changes, all questions of jurisdiction and sovereignty over them. To declare that they have been, since the Treaty of 1905, settled in favor of the country to which they are attached, this to be determined entirely by their position with reference to the fixed boundary line is unwarranted. We think it clear, then, that the Treaty of 1905 settled by the force of its terms, and from the date of its ratification, all questions of territorial jurisdiction and sovereignty with respect to the lands lying on either side of the fixed boundary. It did this specifically in terms in article 1 of the Treaty as to the fifty-eight bancos named and described. It declared that the dominion and jurisdiction "of so many of the 58 bancos as may remain on the right bank of the river shall pass to Mexico, while that of those on the left bank shall pass to the United States." Article 2, we think, had the same effect to then pass to the jurisdiction respectively of the United States and Mexico, according to their position with reference to the boundary line, the San Lorenzo banco and all other bancos then existing. Article 3 directed the boundary commission to proceed to the places where these bancos have been formed and to apply to them the principles of articles 1 and 2. It is mandatory; it speaks of facts accomplished. It gives the commission no power to create bancos or cede territory. It obligates them to discover bancos and accepting them as created to monument them. We think, therefore, that the commission's findings should not be given the effect of determining whether the attachment of the banco to Mexico before 1898 had been avulsive or erosive, occurred in 1897 or at any other par-

[12] San Lorenzo Title & Improvement Co. v. Clardy (Tex. Civ. App.) 43 S.W.(2d) 315, pages 319 to 324.

ticular time, either before or after the rights of defendants and of those under whom they claim, had attached. It should be given the effect, and that alone, of settling and forever setting at rest, in favor of Texas as of the Treaty date, all questions of sovereignty and jurisdiction over that banco.

We are further, however, of the opinion that, if the finding that the land was a banco must be taken under the Treaty as a finding that the land had been before 1898 Mexican territory, and as entitled to full weight and effect not only publicly, but as between the parties to this suit as a binding determination that the property was Mexican territory when the avulsion of 1898 occurred, plaintiff can take no comfort from the commission's findings. They show also that the land has been actually, at least since 1898, and legally since 1905 under the binding terms of the Treaty as applied to the facts, Texas territory. If the land was, as contended by plaintiff, a true banco, in existence when the Treaty was signed, it was in principle then assigned to and it became a part of Texas from and after 1898. If defendants are right that it was not it has always been Texas soil. If it was a true banco, after the signing of the Treaty neither sovereignty could do any act affecting it to the prejudice of, or otherwise than in accordance with, the result which the application of the Treaty principles required. Any action taken thereafter by either government in the attempted assertion of jurisdiction over it other than by way of. policing it, particularly by way of attempts to grant titles or disturb those already granted, could have no effect on it. Kenedy Pasture Co. v. State, 111 Tex. 200, 231 S. W. 683; Davis v. Police Jury of Concordia Parish, 9 How. 280, 13 L. Ed. 138; San Lorenzo Title & Imp. Co. v. Clardy (Tex. Civ. App.) 48 S.W.(2d) 316; San Lorenzo Title & Imp. Co. v. City Mortg. Co. (Tex. Civ. App.) 48 S.W.(2d) 310; San Lorenzo Title & Imp. Co. v. Caples (Tex. Civ. App.) 48 S.W.(2d) 329; United States v. Reynes, 9 How. 127, 13 L. Ed. 74. Further, if we fully accept plaintiff's contention that the Mexican court had jurisdiction over the banco until 1930, it must be held under the evidence in this case, that the court proceedings taken were void, because they failed to comply with the provisions of the Chihuahua Code. Full and exact compliance with these was essential to the validity of plaintiff's title.

 The proceeding under which he claims was a special one. No jurisdictional pre-

sumptions may be entertained in regard to it. The proof must show the jurisdiction. This is required of judgments and other official acts entered in special proceedings, even in domestic ones. Cunningham v. Robison, 104 Tex. 227, 136 S. W. 441; Mingus v. Wadley, 115 Tex. 551, 285 S. W. 1084; Foster v. Glazener, 27 Ala. 391; Thatcher v. Powell, 6 Wheat. 119, 5 L. Ed. 221; Hancock v. McKinney, 7 Tex. 384; Wiederanders v. Texas, 64 Tex. 133. Articles 727, 728, 729 and 730 of the Code,[13] relied on by plaintiff make it clear that jurisdiction in such a proceeding as this depends upon (1) that the property has no certain or known owner, or that it has been abandoned by the owner; (2) that if not in possession under sufficient title to support it the property must be, by a sequestration, an actual taking of the property, brought into the possession of the court; (3) if there is possession of it so that it cannot be sequestrated, the owner or possessor shall be notified of the libel. The record here shows an absolute disregard of these requirements. It shows that the tribunal was fully aware of the fact that the property was by the Treaty, at least inchoately, a part of Texas. It first dismissed the proceeding on the ground that "it is not proper to sequestrate the property referred to, and the sequestration thereof is refused because the same is outside of the jurisdiction of this court." In the renewed proceedings it conclusively appeared not only that the land was outside of the actual jurisdiction of the court, but that there were many persons in possession of it under American titles. When, notwithstanding these facts which made sequestration impossible and established that the land was not vacant or abandoned, the court undertook to proceed further, all of its actions were void

[13] Article 727: "Real estate which has no certain or known owner or that which has been abandoned by the owner, is vacant property.

Article 728: "Anyone having information of the existence of vacant property within the territory of the State and desires to obtain the part conferred upon the informer, may libel the same before the Court of First Instance of the District in which the real estate may be located.

Article 729: "The libel having been filed, the Judge shall order the sequestration of the same provided it is not in the possession of some one by reason of ownership, lease or title sufficient to support possession.

Article 730: "The sequestration having been made effective, if the same should be proper, and not having been made effective, in the proper case, the owner or possessor shall be notified of the filing of the libel and the notice thereof shall be published in the customary places and also in the Official Periodical of the State, in order that all parties believing themselves to have the rights in said real property, may appear and present proof thereof within a period of three months."

for want of that which is essential to a proceeding in rem, the actual possession by the court of the res sought to be acted on. Rose v. Himely, 4 Cranch, 241, 2 L. Ed. 608; The Rio Grande, 23 Wall. 458, 23 L. Ed. 158; N. Y. Life Ins. Co. v. Dunlevy, 241 U. S. 518, 36 S. Ct. 613, 60 L. Ed. 1140. Further, the proceedings are fatally void because on their face they show a complete disregard of the fundamental maxim, audita alteram partem. They show that notwithstanding the requirement of the Code that those in possession be served with notice of the proceedings and the fact known to the court, that there were persons in possession, no notice was given them. A domestic judgment taken under such circumstances would be without force or effect. Windsor v. McVeigh, 93 U. S. 274, 23 L. Ed. 914; Baker v. Baker, Eccles & Co., 242 U. S. 394, 37 S. Ct. 152, 61 L. Ed. 386. Under these circumstances, the foreign judgment relied on is utterly void and unavailing. Banco Minero v. Masterson, 106 Tex. 522, 172 S. W. 711.

Finding the claim of the plaintiff entirely without legal or equitable ground, we approve the findings of the District Court and affirm its judgment.