### FRAGOSO v. CISNEROS et al.
### No. 4111.

Court of Civil Appeals of Texas. El Paso.
July 10, 1941.

Rehearing Denied Oct. 9, 1941.

C. K. Richards, of Rankin, and Fred Kowalski, of Ozona, for appellant.

H. L. Faulk, Rentfro, Rentfro & Rentfro, H. B. Galbraith, and H. A. Garcia, all of Brownsville, for appellees.

PRICE, Chief Justice.

This is an appeal from a judgment of the District Court of Cameron County, Texas, sustaining an exception to plaintiff's petition and, upon plaintiff declining to amend, dismissing her action.

Plaintiff's asserted cause of action was in the nature of an action of trespass to try title. A title emanating from the Republic of Mexico was claimed, and also a title by limitation under the law of Mexico. The land involved is situated in Cameron County and known as Banco No. 80, also as Caja Pinto Banco, the metes and bounds thereof are set forth. It is alleged that prior to and sometime during the year 1900 the land was situated adjacent to and south of the Rio Grande, and was in the State of Tamaulipas, Republic of Mexico; that by an avulsive change of the river in that year it was cut off from the Republic of Mexico and became attached to the United States of America. Thereafter, acting by authority of the Convention between the United States and Mexico, the International Boundary Commission declared same a banco.

Plaintiff's original petition was filed on the 21st day of November, A. D. 1930, the amended petition on April 6, 1940. The allegations of the trial petition disclose that since 1917 the defendants have been in peaceable and adverse possession of the property in controversy up to the filing of plaintiff's action. It was conceded in the trial court, and here conceded, that if the land was part of the State of Texas and subject to her laws during the adverse and peaceable possession of defendants, that defendants have title by limitation. It is also conceded that upon this land being designated in the Treaty of 1905 as a banco same became a part of the United States of America, but it is not conceded that on the effective date of the Treaty it became a part of the State of Texas.

The International Boundary Commission came into being by virtue of a treaty between the United States and Mexico in 1884. See 24 U.S.Statutes, 1011.

The Treaty of Guadalupe Hidalgo made in 1848 provided as to the boundary as fol-

lows: "The boundary line between the two republics shall commence in the Gulf of Mexico, three leagues from land, opposite the mouth of the Rio Grande, otherwise called Rio Bravo del Norte, or opposite the mouth of its deepest branch, if it should have more than one branch emptying directly into the sea; from thence up the middle of that river, following the deepest channel, where it has more than one, to the point where it strikes the southern boundary of New Mexico; thence, westwardly, along the whole southern boundary of New Mexico (which runs north of the town called Paso) to its western termination; thence, northward, along the western line of New Mexico, until it intersects the first branch of the River Gila; (or if it should not intersect any branch of that river, then to the point on the said line nearest to such branch, and thence in a direct line to the same;) thence down the middle of the said branch and of the said river, until it empties into the Rio Colorado; thence across the Rio Colorado, following the division line between Upper and Lower California, to the Pacific Ocean. * * *" See 9 U.S.Statutes, 922, 926, art. 5.

On account of the channel of the Rio Grande being subject to frequent and rapid change, considerable difficulty was experienced by each country and by the citizens of each country. In the spirit of amity and friendliness between the two nations several treaties or conventions were entered into in regard to marking and establishing evidence from time to time as to the boundary established by the Treaty of 1848. By these treaties it was recognized that the Treaty of Guadalupe Hidalgo fixed and governed the boundary.

In 1884 a provision by treaty was made relative to changes in the river bed. It reaffirms the basic treaty, but provides in substance that the main channel of the river shall be the boundary, notwithstanding any alteration of the banks or in the course thereof, provided such alterations were effected by natural causes through the slow and gradual erosion and deposit of alluvium and not by the abandonment of an existing river bed and the opening of a new one. 24 U.S.Statutes, 1011.

In 1889, March 1, 26 U.S.Statutes, 1512 a Boundary Commission was created. The chief function of this Boundary Commission seems to have been to determine whether changes had been made by avulsion or erosion, and giving them powers of determination in regard to artificial structures erected in the bed of the river. Negotiations and correspondence continued from time to time between the two countries. Great trouble and vexation continued by reason of the fact that frequently by changes in the river, which under the existing treaties did not affect a change of title and jurisdiction, Mexican land was thrown on the American side of the river and separated from other Mexican lands; likewise this was true as to American territory falling on the Mexican side of the river. These areas were referred to as "bancos." Many of these bancos had been marked and monumented, and thus evidence of the true boundary line between the two countries preserved. As stated by Sr. Mariscal in a communication to a representative of the United States Government dated in May, 1899:

"Under the old and accepted system which we have applied to the Bravo, that of using rivers to define frontier boundary, it must be accepted as an invariable basis that one bank belongs to one country and the bank opposite to the other. The actual boundary, where the bancos are situated, interferes with the application of this basis, and therefore, nothing is better than to eliminate, granting that it is not only possible but easy, the elements which interfere with it.

"This principle being accepted, it remains to adopt the form of applying it, and there can be no other form than that of the diplomatic convention." San Lorenzo Title & Imp. Co. v. Clardy, Tex.Civ.App., 48 S.W.2d 315, loc. cit. 323

The course of negotiations between the two countries is set out in great detail in the case above cited, as likewise in the case of Willis v. First Real Estate & Investment Co., 5 Cir., 68 F.2d 671. To avoid unduly lengthening this opinion we refer to these two cases for a complete and accurate statement of these negotiations which finally resulted in the Treaty or Convention of 1905, 35 Stat. 1863, which was formally approved in 1907. Article I of such treaty is as follows:

"The fifty-eight (58) bancos surveyed and described in the report of the consulting engineers, dated May 30, 1898, to which reference is made in the record of proceedings of the International Boundary Commission, dated June 14, 1898, and which are drawn on fifty-four (54) maps on a scale of one to five thousand (1 to 5000),

and three index maps, signed by the Commissioners and by the Plenipotentiaries appointed by the convention, are hereby eliminated from the effects of Article II of the Treaty of November 12, 1884.

"Within the part of the Rio Grande comprised between its mouth and its confluence with the San Juan River the boundary line between the two countries shall be the broken red line shown on the said maps—that is, it shall follow the deepest channel of the stream—and the dominion and jurisdiction of so many of the aforesaid fifty-eight (58) bancos as may remain on the right bank of the river shall pass to Mexico, and the dominion and jurisdiction of those of the said fifty-eight (58) bancos which may remain on the left bank shall pass to the United States of America."

A paragraph in Article II of that treaty is as follows: "There are hereby excepted from this provision the portions of land segregated by the change in the bed of the said rivers having an area of over two hundred and fifty (250) hectares, or a population of over two hundred (200) souls, and which shall not be considered as bancos for the purposes of this treaty and shall not be eliminated, the old bed of the river remaining, therefore, the boundary in such cases."

Interesting discussions as to the Treaty of 1905 are to be found in the following cases: San Lorenzo Title & Imp. Co. v. Clardy, Tex.Civ.App., 48 S.W.2d 315, affirmed, 124 Tex. 31, 73 S.W.2d 516; Willis v. First Real Estate & Inv. Co., 5 Cir., 68 F.2d 671; San Lorenzo Title & Imp. Co. v. City Mortgage Co., Tex.Civ.App., 48 S.W.2d 310, affirmed, 124 Tex. 25, 73 S. W.2d 513; San Lorenzo Title & Imp. Co. v. Caples, Tex.Civ.App., 48 S.W.2d 329, affirmed, 124 Tex. 33, 73 S.W.2d 516.

Effective December 19, 1836, the Congress of the Republic of Texas declared in substance that the boundary of the Republic, insofar as applicable here, should be from the mouth of the Rio Grande; thence up the principal stream of the said river to its source. I Gammel, 1193; Paschal's Digest, Art. 438.

On June 23, 1845, the Congress of Texas gave its assent to the annexation of the Republic to the United States as a state thereof: "Said State to be formed subject to the adjustment by this Government of all questions of boundary that may arise with other Governments." II Gammel, 1200. By "this Government" was meant the Government of the United States.

On August 27, 1845, a Constitution was adopted which was approved by joint resolution of the Congress of the United States and Texas. Texas was thus admitted to the Union: "On an equal footing with the original states in all respects whatever." Paschal's Digest, p. 46.

The war between the United States and Mexico ensued subsequent to the incorporation of Texas into the United States as a state thereof. The Treaty of Guadalupe Hidalgo was entered into after the termination of such war.

■ Beyond question, the Treaty of Guadalupe Hidalgo fixed the boundary between the United States and Mexico. This boundary, insofar as pertinent here, was likewise a boundary of the State of Texas. This treaty, with the modification discussed, still fixes the boundary between the United States and Mexico.

It is conceded by the parties hereto that from the elimination of Banco No. 80 by the Treaty of 1905, it became a part of the United States of America. This concession is in strict accord with the law governing.

The question is: Did it on that date become a part of the State of Texas, or did it become such only upon the Act of the United States so conditionally decreeing and the acceptance of the State of Texas of the condition?

Before discussing the respective legislative acts of the United States and Texas anent this matter, let us briefly consider the nature of a banco within the meaning of the treaty in question.

A banco may exist regardless of its area or population. It existed where the Rio Grande, through natural causes, other than by alluvium, left its old channel and established a new permanent channel, leaving distinctive banks of the old channel. That this is the general nature of a banco is evidenced by the letter of that great statesman and lawyer, Sr. Mariscal, a portion of which letter we have heretofore quoted. The foregoing is not intended as a strict or accurate definition of a banco, but will, we think, suffice here. The evidence of the leaving of distinctive banks of the old river is perhaps not essential to the existence of a banco within the meaning of the treaty and the negotiations leading up thereto. San Lorenzo Title & Imp. Co. v.

City Mortgage Co., Tex.Civ.App., 48 S.W. 2d 310.

■ Under the Treaty of 1905 the jurisdiction over a title to a banco so formed was not necessarily affected. A banco inhabited by more than 200 souls or having an area of more than 250 hectares was excepted from the provisions of the agreement. As to an excepted banco the duty of the Commission was to mark and preserve evidence of the true boundary line, "the abandoned channel of the Rio Grande." It was only bancos having less than 200 souls and less than 250 hectares that might be eliminated. By elimination was meant that the jurisdiction over and title to passed to the country on whose side of the new river such a banco was located. Private titles were unaffected by the change of sovereignty. A due regard for rights of property and of citizenship is evidenced by the treaty. The inhabitants of the eliminated banco might choose between the two countries.

As has been said, the banco we have in question here was eliminated by the Treaty of 1905. It is to be noted that a banco that might be eliminated was a small area and the population small. The area was less than 640 acres. In the thousand miles or more that the Rio Grande · forms the boundary it was reasonable to assume that the loss and gain would be equal. Provision was likewise made for the elimination of bancos that might be formed in the future.

The 67th Congress of the United States passed an Act, which was approved January 27, 1922, which was in substance as follows: Jurisdiction was ceded over the bancos formed or thereafter to be formed to Texas, provided that upon the acceptance of this Act by the State of Texas, same become a part of the State of Texas and be under civil and criminal jurisdiction of said State. See Acts of 67th Congress, Sess. 2, Chap. 34, 1922, 42 Stat. 359.

By an Act effective June 12, 1923, General Laws of Texas, Regular Session 38th Legislature, Senate Bill No. 193, Chap. 101, p. 200, Texas met the conditions of the Act of Congress and accepted the banco as a part of Texas. In the emergency clause of the Act of the Texas Legislature it is recited that an emergency is created by the fact that taxes are not paid on said lands, and that offenses committed on said bancos are not punishable by state laws. It is asserted the Act of Congress and the Act of the Legislature of Texas demonstrate that the bancos in question never before June 12, 1923, became subject to the civil and criminal laws of Texas.

A perusal of the two Acts lends strong support to this position. If this was not the case, what was the necessity of the legislation? It must be assumed that the Congress and the Legislature each at least believed the question doubtful. The question, to say the least, was doubtful. Whatever was the true status of the matter, it was wise for the legislative departments of the United States and the State to set it ever at rest.

It is in substance asserted here that the Congress had no power to add territory to the State of Texas. The addition of territory increased the responsibility of the Government thereof. If the Congress of the United States had not the power under the Constitution to add territory to the State of Texas, it had not the power to . decrease the area of the State of Texas. If the treaty, which is the supreme law of the land, gave territory to the United States, it at the same time took away territory from the United States. The eliminated bancos falling to Mexico were Texas territory. The answer is, we think, that the treaty was not a cession of territory by either Government to the other. Neither Government so considered it. It was, we think, but an adjustment of a fixed boundary line where incidental to the exercise of the sovereign power of fixing a boundary between two nations trifling and unimportant cessions were made. At times it was difficult to determine how a change had been effected, whether by erosion and the deposit of alluvium or by avulsion. In such cases the function of the Boundary Commission was to locate the boundary. In such cases the conditional provision as to change of jurisdiction clearly was not a cession by either. San Lorenzo Title & Improvement Co. v. Caples, Tex.Civ.App., 48 S.W.2d 329, loc.cit. 331.

■ Broad and unrestricted as the treaty making power of the United States under the Constitution is, we believe there is reason and authority for the assertion that thereby territory of the United States or of a state may not be ceded to a foreign power. De Geofroy v. Riggs, 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642; Ft. Leavenworth R. R. Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264.

These very questions arose in the course of the discussion of the treaty. Sr. Romero advanced the idea that under the Con-

stitution of Mexico territory could not be ceded to a foreign power. Sr. Mariscal likewise, in a communication to Mr. Clayton, our Minister, advanced the same idea. In 1894 Mr. Hay, our Secretary of State, wrote Mr. Clayton suggesting that the treaty proposed was not a cession of territory within the meaning of the Constitution, but rather the fixing of a boundary. See San Lorenzo Title & Imp. Co. v. Clardy, supra, 48 S.W.2d loc.cit. 323, 324. Mr. Hay, no doubt, had in mind the Constitution of the United States as well as the Constitution of Mexico, the provisions thereof in regard to the matter in issue being very similar.

■ It may be remarked in passing that the negotiations on the part of the representatives of each Government unmistakably evidence the realization that each country is governed by law, and careful regard is evidenced to stay strictly within the limits of the high powers with the exercise of which they were entrusted by their respective Governments. Every move seems to have been made with the idea of the just solution of a difficult and vexing problem. We believe the treaty, viewed in the light of the prior discussions leading up thereto, did not constitute a cession of territory by either of the high contracting parties. Their interpretation, we think, is entitled to great weight here as determining that question. San Lorenzo Title & Improvement Co. v. Caples, supra.

■ A treaty between nations fixing an international boundary is binding on the citizens of each country, and determines their rights. Coffee v. Groover, 123 U.S. 1, 8 S.Ct. 1, 31 L.Ed. 51; United States v. Stone, 2 Wall. 525, 17 L.Ed. 765.

On the American continent at least it has been deemed binding on the two contracting sovereignties.

■ Beyond any question the various acts in law evidenced by the treaties were intended simply to enforce the spirit and intent of the basic treaty, that of Guadalupe Hidalgo. In facilitating the realization of this intent minor adjustments of the boundary were made. These adjustments were trifling in character. The location of a boundary as distinguished from the establishment thereof was all that was involved.

■ These minor adjustments changed the boundary line of the State of Texas in a certain sense, changed it in that it took property away from the State that had formerly been subject to her jurisdiction. Equitably at least Texas was entitled to the gaining of territory which was occasioned by this loss of territory. The legislative acts of the United States and Texas evidence a recognition of this equity. In the adjustment of the boundary line by the Treaty of 1905, in our opinion, the United States adjusted the boundary line of Texas as to the Republic of Mexico. This, we believe, from the moment of the effective date of the treaty constituted the eliminated bancos a part of Texas and that the territory was subject to both the civil and criminal laws of Texas. This is the common sense, practical construction. The United States had not the facilities to administer local government within the limited areas affected, the State of Texas did. The boundary fixed was the boundary of Texas as to Mexico, and her boundary as a member of the Union. Jurisdiction over the eliminated bancos was the right and duty of Texas from the moment of their elimination. This, in our opinion, accords with the obligations of the United States under the treaty. If the United States should acquire new citizens, by what courts could their rights be protected? If the election was otherwise, what court could protect the property rights of Mexican citizens?

What has been said, of course, has no reference to the rectification of the river as provided for in the Convention between the United States and Mexico, and which has been to a large extent accomplished. The lands falling on one side or the other of the river are governed by entirely different principles than an eliminated banco under the Treaty of 1905. The land so acquired is held by the United States in a proprietary capacity.

The amended petition of plaintiff shows that if any cause of action she ever had, same is barred by the statutes of limitation. The court did not err in sustaining the exception.

The judgment is ordered affirmed.