

# ATTORNEY GENERAL OF TEXAS

### GREG ABBOTT

July 18, 2005

The Honorable Frank Madla, Chair
Committee on Intergovernmental Relations
Texas State Senate
Post Office Box 12068
Austin, Texas 78711-2068

Opinion No. GA-0339

Re: Whether the Live Oak Treaty of 1838 is still a binding agreement (RQ-0310-GA)

Dear Senator Madla:

Without factual background or context, you ask us to opine whether the "Live Oak Treaty, which was signed on January 8, 1838 by the Lipan Apaches of Texas, and subsequently adopted, ratified and concurred[1] on by the 1st and 3rd Texas Legislature,[2] [is] still considered a binding agreement."[3]

The treaty about which you inquire, entitled "Treaty Between the Republic of Texas and the Lipan Apache Indians, January 8, 1838," was executed between the Lipan Indians ("Lipan") and the Republic of Texas ("Republic").[4] *See* Request Letter, *supra* note 3, at 5-7. The preamble to the treaty recites that the treaty is to secure the "Peace and perpetual friendship between the Republic

---

[1]The Constitution of the Republic of Texas authorized the President of the Republic to make treaties with the advice and consent of two-thirds of the Senate. *See* REPUB. TEX. CONST. OF 1836, art. VI, § 5, *reprinted in* 1 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822-1897, at 1069, 1076 (Austin, Gammel Book Co. 1898). We find no official record in the early documents of the Republic that the Senate of the Republic of Texas ratified the Live Oak Treaty of 1838. We note that Senate records from May 4 through May 24, 1838 have been lost. *See* Anna Muckleroy, *The Indian Policy of the Republic of Texas*, 26 SW. HIST. Q. at 20 & n.62 (1922). For purposes of this opinion we will assume the Live Oak Treaty of 1838 was properly ratified by the Republic.

[2]The Republic of Texas was governed by the Texas Congress. *See* 5 THE NEW HANDBOOK OF TEXAS 537-48 (Ron Tyler et al. eds., 1996) (published by the Texas State Historical Association, *also available at* http://www.tsha.utexas.edu/handbook/online/articles/RR/mzr2.html).

[3]Letter from Honorable Frank Madla, Chair, Committee on Intergovernmental Relations, Texas State Senate, to Honorable Greg Abbott, Texas Attorney General (Jan. 14, 2005) (on file with Opinion Committee, *also available at* http://www.oag.state.tx.us) [hereinafter Request Letter].

[4]*See* Treaty Between the Republic of Texas and the Lipan Apache Indians, January 8, 1838, Dorman H. Winfrey and James M. Day, THE INDIAN PAPERS OF TEXAS AND THE SOUTHWEST 1825-1916, Vol. I, Doc. No. 16, at 30-32 (1995) [hereinafter Live Oak Treaty]. Throughout this opinion we make no effort to impose or correct for modern spelling. Instead, we retain the spelling of names and titles as used in the treaties.

of Texas and the Lipan Tribe of Indians." Live Oak Treaty, *supra* note 4. The treaty is signed by James Power on behalf of the Republic of Texas and Cuelgas de Castro as ruling Chief of the Lipan. *See id.* Although you inquire only about the validity of the 1838 Live Oak Treaty, you include with your request additional treaties involving the Lipan Indians: the Tehuacana Creek Treaty, dated October 9, 1844, and the San Saba Treaty, dated October 28, 1851.[5] *See* Request Letter, *supra* note 3, at 8-17.

The Tehuacana Creek Treaty was executed between the "Republic of Texas and the Comanche, Keechi, Waco, Caddo, Anadarko, Ioni, Delaware, Shawnee, Cherokee, Lipan and Tawakoni tribes." Tehuacana Creek Treaty, *supra* note 5. It is signed on behalf of the Republic of Texas by three commissioners of the Republic: Colonel Thomas I. Smith, Colonel John C. Neill, and General Messrs E. Morehouse. *See id.* Ramon Castro and Captain Chico signed the treaty on behalf of the Lipan Indians. *See id.* The Tehuacana Creek Treaty recites that the parties "are now willing to open the path of lasting peace, friendship and trade, and are desirous to establish certain solemn rules for the regulation of their mutual intercourse." *Id.*

The San Saba Treaty was made between the United States and the "undersigned chiefs counsellers and head men of the Comanche, Lipan, & Mescalero tribes and their associate bands." San Saba Treaty, *supra* note 5, at 149. The San Saba Treaty is signed by John A. Rogers, Special Agent for the Indians of Texas and Commissioner on behalf of the United States, and a large contingent of Lipan Indians including Manuel Hernandes, Captain John Castro and Captain John Flaco. *See id.* at 152-53. In the San Saba Treaty, the parties expressly agree to and acknowledge the articles of the Council Springs Treaty, dated May 15, 1846. *See id.* art. II, at 149. It appears that the purpose of the San Saba Treaty was to enable the United States to fulfill its obligations under its Guadalupe-Hidalgo Treaty with Mexico. *See id.* art. III, at 150.[6] The United States agreed that "special care shall then be taken not to place its Indian occupants under the necessity of seeking new homes by committing those invasions which the United States . . . obligated themselves to restrain." *Id.* at 151. The signatory chiefs agreed to place themselves under the care and protection of the authorities of the United States and to bind themselves to "comply with the provisions of said treaty between the United States and Mexico." *Id.*

---

[5]*See* Tehuacana Creek Treaty, Treaty of Peace, Friendship and Commerce, October 9, 1844, Dorman H. Winfrey and James M. Day, THE INDIAN PAPERS OF TEXAS AND THE SOUTHWEST 1825-1916, Vol. II, Doc. No. 76, at 114-19 (1995) [hereinafter Tehuacana Creek Treaty]; San Saba Treaty, Council Ground San Sabre, Bexar County, Texas, October 28, 1851, Dorman H. Winfrey and James M. Day, THE INDIAN PAPERS OF TEXAS AND THE SOUTHWEST 1825-1916, Vol. III, Doc. No. 104, at 149-54 (1995) [hereinafter San Saba Treaty]. You also include two additional treaties of the Lipan Indians: a treaty between the Lipan Apache and the Mexican government in 1791, and the Lipan Apache Peace Treaty with Mexico of August 17, 1822. *See* Request Letter, *supra* note 3, at 2-4. You do not ask about the continuing validity of these treaties that predate the Live Oak Treaty, and we do not consider them in this opinion.

[6]The Guadalupe-Hidalgo Treaty between the United States and Mexico, executed on February 2, 1848, ended the Mexican War hostilities between Mexico and the United States, *see United States v. Abeyta*, 632 F. Supp. 1301, 1304 (D. N.M. 1986), and established the border between the two countries. *See Fragoso v. Cisneros*, 154 S.W.2d 991, 992-93 (Tex. Civ. App.–El Paso 1941, writ ref'd w.o.m.). In the Guadalupe-Hidalgo Treaty, the United States pledged, among other things, to restrain Indian incursions into Mexico. *See* Treaty of Guadalupe Hidalgo, February 2, 1848, U.S.-Mex., art. V, 9 Stat. 922.

You do not include them with your request, but we are aware of two additional treaties involving the Lipan Indians. On May 15, 1846, at Council Springs, Texas, the United States and the "undersigned Chiefs, Counsellors, and the Warriors of the Comanche, Ioni, Ana-darko, Caddo, Lipan, Longwa, Keechi, Tawakoni, Wichita, and Waco Tribes of Indians" entered into a treaty.[7] It is signed by P. M. Butler and M. G. Lewis for the United States. *See* Council Springs Treaty, *supra* note 7, at 49. Although it recites the inclusion of the Lipan Indians, no signatory of the Lipan tribe appears at the end of the treaty. *See id.* at 49-51. In it, the representatives of the Indian tribes acknowledged themselves "to be under the protection of the United States, and of no other power, state, or sovereignty whatever." *Id.* art. I, at 44.

In 1850, at Spring Creek, a treaty was entered into between the United States and the Comanche, Caddo, Lipan, Quapaw, Tawakoni, and Waco Tribes.[8] It is executed by John H. Rollins for the United States and Chi-ci-to, Chi-po-ti, Ye-keh-tas-na and Keh-rauch on behalf of the Lipan. *See* Spring Creek Treaty, *supra* note 8, art. 20th, at 135.

Thus, we are aware of five Lipan Indian treaties, listed in chronological order as follows: Live Oak Treaty, 1838; Tehuacana Creek Treaty, 1844; Council Springs Treaty, 1846; Spring Creek Treaty, 1850; and the San Saba Treaty, 1851.

## I.    Abrogation of Indian Treaties

"Although all Indian treaties were executed over 100 years ago, unless otherwise modified, these treaties remain in effect." Sally J. Johnson, *Honoring Treaty Rights and Conserving Endangered Species after United States v. Dion*, 13 PUB. LAND L.REV. 179, 179 (1992) (citing *Tsosie v. United States*, 825 F.2d 393 (Fed. Cir. 1987)). Pursuant to the Supremacy Clause of the United States Constitution, *see* U.S. CONST. art. VI, cl. 2, Indian treaties become the law of the land and supersede conflicting state laws or state constitutional provisions. *See, e.g., Antoine v. Washington*, 420 U.S. 194, 204 (1975); *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 196 (1876). Although Congress may not impair rights vested under Indian treaties, it may supersede or abrogate the treaties by legislation or subsequent treaty. *See South Dakota v. Bourland*, 508 U.S. 679, 687 (1993); *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 493 (7th Cir. 1993); *United States v. Sohappy*, 770 F.2d 816, 818 (9th Cir. 1985); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 459-60 (D. N.J. 1999); *United States v. Michigan*, 471 F. Supp. 192, 253 (W. D. Mich. 1979).

An intent to abrogate treaty rights must be expressed clearly and unequivocally, but need not be explicit where it is clear. *See United States v. Dion*, 476 U.S. 734, 739-40 (1986). A later statute

---

[7]Treaty with the Comanche and Other Tribes, May 15, 1846, Dorman H. Winfrey and James M. Day, THE INDIAN PAPERS OF TEXAS AND THE SOUTHWEST 1825-1916, Vol. III, Doc. No. 59, at 43-52 (1995) [hereinafter Council Springs Treaty].

[8]Treaty between the United States and the Comanche, Caddo, Lipan, Quapaw, Tawakoni and Waco Tribes of Indians, December 10, 1850, Dorman H. Winfrey and James M. Day, THE INDIAN PAPERS OF TEXAS AND THE SOUTHWEST 1825-1916, Vol. III, Doc. No. 98, at 130-37 (1995) [hereinafter Spring Creek Treaty].

or treaty must be harmonized with existing treaties to the extent possible. *See Menominee Tribe v. United States*, 391 U.S. 404, 411 (1968). However, "when a subsequent inconsistent law cannot be reconciled with a prior treaty, the subsequent law is deemed to abrogate the treaty to the extent of the inconsistency, without specific words of abrogation." *Iwanowa*, 67 F. Supp. 2d at 459 (citing *Breard v. Greene*, 523 U.S. 371, 376 (1998)). Similarly, where there is an irreconcilable conflict between a subsequent treaty and a prior treaty, the new treaty abrogates the prior inconsistent treaty or provision therein. *See id.*; *see also Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("When the two [treaties] relate to the same subject [and] . . . are inconsistent, the last one in date will control the other."); *Farrell v. United States*, 110 F. 942, 951 (8th Cir. 1901).

It is important to note here that the Live Oak Treaty is essentially a pledge of perpetual friendship between the Republic of Texas and the Lipan Indians. *See* Live Oak Treaty, *supra* note 4, at 30. While it does contain some specific provisions, the Live Oak Treaty and the four subsequent treaties we examine do not relate to or establish rights to any piece or tract of land, uses of land, or particular rights that stem from the land, such as the usufructuary rights of hunting and fishing. In most instances where a court considers a treaty, a particular right guaranteed or bestowed by the treaty is the issue. The question of whether a treaty has been abrogated in such instances, then, is whether a subsequent legislative act or treaty interfered with the right protected or bestowed in the prior treaty as to render the prior right void. If so, the particular right, not the whole treaty, is considered abrogated. You do not inquire about a particular aspect of, or right bestowed in, the Live Oak Treaty. *See generally* Request Letter, *supra* note 3. Instead, you ask us to opine on the wholesale validity of the entire treaty. *See id.* We have found no case from the federal courts that engages in that task. However, utilizing the abrogation principles recited above, we endeavor to answer your question as we think the federal courts would answer it.

## II.     Analysis

Legislation or a subsequent treaty may result in the abrogation of a treaty. *See Kansas or Kaw Tribe v. United States*, 80 Ct. Cl. 264, 304 (1934). "[C]ourts must construe successive treaties in conjunction with the language of earlier treaties." *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 457 (7th Cir. 1998) (citing *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 768 (1985) and *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 176-80 (1947)). Here, you inquire about a treaty executed in 1838. The Live Oak Treaty is followed in time by four treaties made by the same tribe. Therefore, we will examine the provisions of each of those treaties to determine if the Live Oak Treaty is abrogated by a subsequent treaty.

### A.     Live Oak Treaty

In order to determine if a subsequent treaty abrogates the Live Oak Treaty, it is necessary to enumerate, at least generally, the terms of the Live Oak Treaty. In "Article 1st," the Republic of Texas promises and guarantees "peace friendship and protection, to [the] Lipan Indians while they remain peaceable and in good faith, and do not disturb the citizens . . . of the Republic of Texas." Live Oak Treaty, *supra* note 4, art. 1st, at 30. Pursuant to "Art. 2nd," the Lipan Indians promise to remain perpetual friends with the Republic. *See id.* art. 2nd, at 30. The Republic agrees,

in "Art. 3," to appoint traders or to establish "trading houses" to accommodate trading between the Republic and the Indians. *See id.* art. 3, at 30. The Republic gives to the Chief, pursuant to "Art. 4th," the value of two hundred and fifty dollars in articles and the Indians agree to deliver "all Cattle, Horses, Mules or other property" lawfully established to belong to citizens of the Republic. *Id.* art. 4th, at 30-31. In "Art. 5," the two parties further agree, stated generally, that persons of one party that commit violence against persons of the other party will be handed over to Republic officials and punished under the laws of the Republic and that neither party will seek redress against the wrongdoer on its own. *See id.* art. 5, at 31. Finally, in "Art. 6th," the Republic agrees to the safety of any member of the Lipan tribe passing through any part of the state in a peaceful manner. *See id.* art. 6th, at 31. In return, the Lipan Indians agree not to "molest[] nor disturb[]" citizens of the Republic or other persons invited to the state while passing through any part of the state. *See id.* at 32.

### B.     Tehuacana Creek Treaty

The Tehuacana Creek Treaty was executed in 1844 between the Republic of Texas and several Indian tribes, including the Lipan. *See* Tehuacana Creek Treaty, *supra* note 5. It consists of twenty-two articles and contains provisions that are similar to those in the Live Oak Treaty, but also contains new provisions relating to different issues. *See id.* For example, the Indian tribes agree to make no treaty with any nation at war with the people of Texas. *See id.* art. III, at 115. The Indian tribes also agree not to trade "with any other people than the people of Texas," so long as they can procure the goods they need from the established trading houses. *Id.* art. VI, at 115. The Republic agrees to supply the Indians with powder, lead, guns, spears and other arms for the hunting of game when peace is fully established. *See id.* art. VIII, at 116. The Republic also agrees that the President may send blacksmiths, mechanics and schoolmasters among the Indians for their benefit and instruction. *See id.* art. XV, at 116. Other provisions of this treaty mirror provisions of the Live Oak Treaty. *See id.* art. I, at 115 ("parties agree and declare, that they will forever live in peace, and always meet as friends and brothers"); art. VII, at 116 (Texas to establish trading houses for convenience and benefit of Indians). We find no provision in the Tehuacana Creek Treaty that clearly abrogates any of the provisions in the Live Oak Treaty. Accordingly, we think a court would construe the provisions of the subsequent Tehuacana Creek Treaty to be in harmony with the Live Oak Treaty.

### C.     Council Springs Treaty & San Saba Treaty

The Council Springs Treaty of 1846 is the first treaty between the Lipan and the United States. *See* Council Springs Treaty, *supra* note 7; *see also* 9 Stat. 844 (U.S. Senate ratification). The Indian tribes that are parties to the treaty initially "acknowledge themselves to be under the protection of the United States, and of no other power, state, or sovereignty whatever." Council Springs Treaty, *supra* note 7, art. I, at 44. We believe this provision is sufficient in itself to abrogate the entire Live Oak Treaty because it is wholly inconsistent with the provisions of the prior Live Oak Treaty. *See Whitney,* 124 U.S. at 194; *Iwanowa,* 67 F. Supp. 2d at 459. Pursuant to Article I, the signatory Indian tribes place themselves under the sole jurisdiction and protection of the United States to the exclusion of any other "power, state or sovereignty." Council Springs

Treaty, *supra* note 7, art. I, at 44. We do not think this language can be harmonized with the letter and spirit of the prior Live Oak Treaty. *See United States v. Payne*, 264 U.S.446, 448 (1924) (stating "while the . . . Act, being later, must control in case of conflict, it should be harmonized with the letter and spirit of the treaty, so far as that can reasonably be done"). The perpetual peace, friendship and protection guaranteed by the Republic of Texas in the Live Oak Treaty involves protection from another power, state or sovereignty that is expressly relinquished in the Council Springs Treaty.

Moreover, the remaining terms of the Council Springs Treaty include similar terms as the Live Oak Treaty. We believe that, taken as a whole, the Council Springs Treaty reveals an intent to establish the relationship between the federal government and the tribes concerning these matters to the exclusion of any prior agreement concerning the same matters, including any agreement with the Republic of Texas. The Council Springs Treaty gives the United States the "sole and exclusive right of regulating trade and intercourse" with the Indian Tribes and to establish trading houses. Council Springs Treaty, *supra* note 7, arts. II, IX, at 44, 47; *compare id. with* Live Oak Treaty, *supra* note 4, art. 3, at 30 (establishing trading houses). The Council Springs Treaty provides for the return of prisoners held by the various Indian Tribes. *See* Council Springs Treaty, *supra* note 7, art. IV, at 45; *compare id., with* Live Oak Treaty, *supra* note 4, art. 4th, at 30-31 (return of "Cattle, Horses, Mules or other property"), *and* art. 6th, at 31-32 (parties shall be secure when passing through territory of other party). It also provides for the punishment of those (of the various tribes and the United States) who commit murder or robbery pursuant to the laws of the State or Territory, *see* Council Springs Treaty, *supra* note 7, art. VII, at 46, and prohibits the stealing of horses. *See id.* art. VIII, at 46-47; *compare id.* arts. VII-VIII, at 46-47, *with* Live Oak Treaty, *supra* note 4, art. 5, at 31 (parties committing violence against the other to be punished under laws of Texas). Finally, the parties pledge perpetual peace. *See* Council Springs Treaty, *supra* note 7, art. X, at 48; *compare id., with* Live Oak Treaty, *supra* note 4, art. 1st, at 30 (pledging peace, friendship and protection), *and* art. 2nd, at 30 (pledging to be perpetual friends of the Republic).

We also believe the circumstances support our conclusion that the Council Springs Treaty evinces an intent on the part of the parties to it that the various Indian tribes relinquish the benefits of the prior relationship with the Republic of Texas in order to avail themselves of the benefits of a relationship with the United States. *See Wichita & Affiliated Bands v. United States*, 89 Ct. Cl. 378, 421 (1939) (stating that the 1846 treaty "appears to have been entered into for the purpose of having the Indians acknowledge themselves to be under the protection of the United States and no other power, state, or sovereignty"). The Republic of Texas became the State of Texas in December 1845, *see* 29 Pub. Res. 1, 29th Cong., 9 Stat. 108 (1845), only months before the 1846 Council Springs Treaty. *See Cook v. United States*, 288 U.S. 102, 112 (1933) ("In construing the Treaty its history should be consulted."). Upon becoming a state, Texas became subject to the United States Constitution which places sole authority for Indian relations in the federal government. *See* U.S. CONST. art. I, § 8, cl. 3; *infra* note 13. In this context, we believe that a federal court would decide that the Council Springs Treaty abrogates the Live Oak Treaty.[9]

---

[9]For the same reasons, a federal court would likely determine that the Council Springs Treaty also abrogates the 1844 Tehuacana Creek Treaty. However, you do not ask about the continuing validity of the Tehuacana Creek Treaty, so we do not offer our opinion on the matter.

As we mentioned earlier in this opinion, *see supra* p. 3, the 1846 Council Springs Treaty itself does not unequivocally show that the Lipan Indians executed the treaty. It recites that the Lipan Indians were a party to the treaty, but no member of the Lipan tribe is shown as having signed the treaty.[10] We do observe that another document from the same time period, a proclamation by the Governor of Texas, recites that the Council Springs Treaty had been entered into by the "Comanche, Wichita, Tawehash, Waco, Keechi, Caddo, Lipan, Tonkawa, and their associate bands."[11] Additionally, the United States Court of Claims recognized that the Lipan Indians were a party to the Council Springs Treaty. *See Lipan Apache Tribe v. United States*, 180 Ct. Cl. 487, 500 (1967) ("Under the Treaty of May 15, 1846 . . . concluded between the United States and several Texas Indian tribes, including the 'Lepan . . . .'"). Irrespective of this evidence that the Lipan Indians were a party to the Council Springs Treaty, the 1851 San Saba Treaty expressly establishes the fact. In it, the parties "acknowledge each and every article of this treaty, entered into, on the fifteenth day of May, on [sic] thousand eight hundred forty six, at Council Springs . . . as obligatory upon us and those we represent as if we had signed and acknowledged the same." San Saba Treaty, *supra* note 5, art. 2nd II, at 149. The San Saba Treaty was executed by nine members of the Lipan Tribe, including Captain John Castro. *Id.* art. IV, at 152.

## D.     Spring Creek Treaty

The Spring Creek Treaty is dated 1850. *See* Spring Creek Treaty, *supra* note 8, at 130. As with the Council Springs Treaty, the representatives of the various tribes "for themselves, and for those under their control and subject to their authority, . . . acknowledge themselves to be under the jurisdiction and protection of the United States of America, and of no other Power, State or Sovereignty whatever." *Id.* art. 1st, at 130. Because we have concluded that the Council Springs Treaty of 1846 abrogates the Live Oak Treaty of 1838, we do not need to consider the effect of the Spring Creek Treaty on the Live Oak Treaty.[12]

## III.     The Republic of Texas Question

Because the Live Oak Treaty about which you inquire was executed between the Lipan Indian tribe and the Republic of Texas, we think the question arises whether the Live Oak Treaty survived the Republic's initial annexation in 1845 by the United States or its 1861 secession from and 1870 readmittance to the Union.[13] However, the execution of the 1846 Council Springs Treaty mere

---

[10]We note that the Ioni, Ana-darko, Caddo and Longwa tribes are also recited as being parties to the treaty but are not represented as signatories to the treaty.

[11]Tex. Gov. Proclamation No. 62, June 1, 1846, Dorman H. Winfrey and James M. Day, THE INDIAN PAPERS OF TEXAS AND THE SOUTHWEST 1825-1916, Vol. III, Doc. No. 62, at 62 (1995).

[12]In addition, we do not find any record that the United States Senate ever ratified the Spring Creek Treaty.

[13]Upon its initial admittance to the Union, the State of Texas became subject to the United States Constitution, *see Calkin v. Cocke*, 55 U.S. 227, 235 (1852) (stating that the State of Texas was admitted to the union on December 29, 1845, on an equal footing with the original states and "all laws of the United States . . . extended over, and to have

(continued...)

months after the Republic's 1845 entrance into the United States makes resolution of the issue unnecessary. *See supra* pp. 5-7. We believe the United States sought the Council Springs Treaty with the various Indian tribes, including the Lipan, precisely because it recognized that there was no longer a treaty with these particular tribes and that one was needed.

## IV.    Conclusion

We believe it likely that a federal court would find that the Council Springs Treaty, wherein the Lipan Indians expressly acknowledge the exclusive jurisdiction and protection of the United States less than one year after the Republic of Texas joined the United States and which includes similar terms, abrogates prior treaties with other powers, states and sovereignties, including the Live Oak Treaty with the Republic of Texas. In such a case, the Live Oak Treaty would no longer be a binding agreement.

Our opinion here is limited to the continuing validity of the Live Oak Treaty. We do not opine on the continued validity of any of the subsequent treaties executed by the Lipan Indians or any of the other Indian tribes.

---

[13](...continued)
full force and effect within, the State"),which gives the federal government exclusive authority over Indians. *See* U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have Power . . . [t]o regulate Commerce . . . with the Indian tribes."). "Under the constitution, no state can enter into any treaty; and it is believed, that, since its adoption, no state, under its own authority, has held a treaty with the Indians." *Oneida Indian Nation v. New York*, 691 F.2d 1070, 1090 (2nd Cir. 1982) (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 581 (1832)). The United States acquired sovereignty over Indians in Texas through the annexation of Texas. *See Choctaw & Chickasaw Nations v. United States & Wichita*, 34 Ct. Cl. 17, 72 (1899) (stating that Treaty of May 15, 1846 "was made in Texas, with Texas tribes, because of the sovereignty which the United States had acquired over [the Indians] by the annexation").

Texas seceded from the Union on February 1, 1861. *See* Act approved Feb. 1, 1861, *reprinted in* 4 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822-1897, at 1519, 1519-20 (Austin Gammel Book Co. 1898). Texas was readmitted to the Union on March 30, 1870. *See* Act approved Mar. 30, 1870, *reprinted in* 6 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822-1897, at 3, 11-12 (Austin Gammel Book Co. 1898) (The first ten volumes of H.P.N. GAMMEL, THE LAWS OF TEXAS 1822-1897 can be accessed online through the University of North Texas website, *see* http://texinfo.library.unt.edu/lawsoftexas/browse.htm.).

## S U M M A R Y

An Indian treaty may be abrogated by subsequent legislation or treaty. The Lipan Indians executed four treaties after executing the 1838 Live Oak Treaty with the Republic of Texas. It is likely a federal court would find that the 1846 Council Springs Treaty between the Lipan Indians and the United States abrogated the 1838 Live Oak Treaty. We do not opine on the continued validity of subsequent treaties.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Charlotte M. Harper
Assistant Attorney General, Opinion Committee